[Cite as *State v. Ward*, 2023-Ohio-328.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellee | : | C.A. No. 29493 |
| | : | |
| v. | : | Trial Court Case No. 2021 CR 01106 |
| | : | |
| ANTONION K. WARD | : | (Criminal Appeal from Common Pleas |
| | : | Court) |
| Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on February 3, 2023

. . . . . . . . . . .

MATHIAS H. HECK, JR., by RICKY L. MURRAY, Attorney for Appellee

CHARLES W. SLICER, III, Attorney for Appellant

. . . . . . . . . . . .

WELBAUM, P.J.

{¶ 1} Appellant, Antonion K. Ward, appeals from his convictions in the Montgomery County Court of Common Pleas after a jury found him guilty of three counts of aggravated vehicular homicide. In support of his appeal, Ward claims that the trial court erred by failing to suppress un-Mirandized statements that he made to police officers during two

separate interviews.   Ward also claims that his convictions were against the manifest weight of the evidence and that his trial counsel provided ineffective assistance during his trial.   Ward further claims that he was denied a fair trial due to the State's engaging in prosecutorial misconduct during closing argument.   For the reasons outlined below, we find that all of Ward's claims lack merit, and we will affirm the judgment of the trial court.

**Facts and Course of Proceedings**

{¶ 2} On May 11, 2021, a Montgomery County grand jury returned an indictment charging Ward with three counts of aggravated vehicular homicide in violation of R.C. 2903.06(A)(2)(a), felonies of the second degree.   The charges arose from a two-vehicle collision that occurred on July 15, 2020, at the intersection of Olive and Little Richmond Roads in the city of Trotwood.   The indictment alleged that Ward had been operating one of the vehicles involved in the collision and that, in doing so, he recklessly caused the deaths of his passengers, Michael Stephens and Elgin Wilson IV, and of the driver of the other vehicle in the collision, Leah Smith.   Ward pled not guilty to the indicted charges and thereafter filed a motion to suppress.   In the motion, Ward sought to suppress statements that he had made to investigating officers during two separate interviews on grounds that the officers did not advise him of his *Miranda* rights before questioning him.

{¶ 3} On March 7, 2022, the trial court held a hearing on Ward's motion to suppress.   At the hearing, the State presented testimony from the officers who had questioned Ward.   The first officer, Trooper Joshua Jones of the State Highway Patrol, testified that he had interviewed Ward on the night of the accident while Ward was at the

hospital receiving medical treatment for his injuries. The second officer, Officer Sherri Jackson of the Trotwood Police Department, testified that she and another officer, Trooper Ambers, had interviewed Ward at his residence two weeks after the accident. Both Tpr. Jones and Ofc. Jackson testified that, at the time of their respective interviews, Ward had not been a criminal suspect, had not been placed under arrest, and had not been advised of his *Miranda* rights before questioning. The officers' testimony also established that the officers had in no way restrained Ward's freedom of movement or his ability to terminate the interviews.

{¶ 4} After considering the officers' testimony and the exhibits, which included a written statement of the questions and answers given during Tpr. Jones' interview and an audio recording of Ofc. Jackson's interview, the trial court determined that neither interview had qualified as a custodial interrogation that required *Miranda* warnings. Accordingly, the trial court overruled Ward's motion to suppress the statements that he had made to each of the officers.

{¶ 5} Following the trial court's ruling on Ward's motion to suppress, the matter proceeded to a three-day jury trial in May 2022. During trial, the State presented testimony from multiple witnesses who had observed the traffic accident. The State also presented testimony from the fire and law enforcement officers who had responded to the scene of the accident and investigated the matter. In addition, the State presented testimony from the coroner who had performed autopsies on the three victims and from an expert traffic accident reconstructionist. Ward also testified in his defense.

{¶ 6} The trial testimony established that on the evening of July 15, 2020, Ward,

who was then 19 years old, drove his mother's Chevy Cruz to pick up his 18-year-old stepbrother, Michael Stephens, and his 18-year-old friend, Elgin Wilson, from a pool party. Ward's plan was to drive Stephens and Wilson to an after-party located at an Airbnb rental house. While traveling to the after-party, Ward stopped his vehicle at a traffic light on Olive Road near the Trotwood police station. An SUV driven by Ward's 17-year-old friend, E'Mariha Combs, was stopped beside Ward in the adjacent lane of traffic. Combs had also been at the pool party and was driving a group of her friends and her 14-year-old brother, Emerson, to the same after-party that Ward and his friends were traveling to attend. Ward and Combs saw each other as they were sitting side-by-side at the traffic light, and they both took off fast on Olive Road once the light turned green.

{¶ 7} Combs testified that, when she took off from the traffic light, she drove 80 miles per hour down Olive Road. Combs testified that Ward kept up with her speed and eventually positioned his vehicle behind her once Olive Road went from two lanes to one. During that time, Combs testified that she and Ward passed two or three vehicles on Olive Road by weaving in and out of the oncoming traffic lane. Combs claimed that, when she approached an intersection with Little Richmond Road, she drove into a turn lane and stopped her vehicle at a traffic light that was positioned at the intersection. Combs testified that Ward then passed her and went straight through the intersection while the traffic light was red. Combs testified that Ward traveled through the intersection at approximately 75 miles per hour without braking. Thereafter, Combs saw Ward's vehicle collide with a vehicle traveling on Little Richmond Road; Ward's vehicle flew into the air,

touched a power line, caught fire, and landed in a nearby wooded area, while the other vehicle flipped over and landed in a ditch off the road.

{¶ 8} Combs' brother, Emerson, who had been in the SUV with Combs, testified to seeing Ward, Stephens, and Wilson stopped next to them at a traffic light by the Trotwood police station.   After that, Emerson testified that Combs started to drive fast down Olive Road, which he noted had a speed limit of 35 miles per hour.   Emerson testified that he told Combs to slow down and that Combs thereafter drove into a turn lane and stopped their vehicle at a red light at the intersection of Little Richmond Road.   Emerson testified that he saw Ward's vehicle pass them on the driver's side and then collide with another vehicle traveling on Little Richmond Road.   Emerson called 9-1-1 to report the accident. An audio-recording of Emerson's 9-1-1 call was played for the jury and admitted into evidence as State's Exhibit 66.   During the call, Emerson can be heard telling the operator that: "The car that is on fire ran a red light."

{¶ 9} Another motorist, Karrie Canady, testified that on the day of the accident, she was driving 40 miles per hour on Olive Road when an SUV and another vehicle following the SUV came up quickly behind her and passed her by driving into the oncoming traffic lane.   Canady testified that both vehicles were traveling at the same rate of speed, which she estimated was approximately 65 to 70 miles per hour.   Canady testified that the SUV took a wide right turn onto Little Richmond Road while the other vehicle behind it went straight through the intersection after the traffic light had turned red.   The next thing Canady remembered was seeing smoke and hearing a collision.   Canady called 9-1-1 and reported the accident; an audio recording of Canady's 9-1-1 call was played for the

jury and admitted into evidence as State's Exhibit 67. During the call, Canady can be heard saying: "There's been a really really bad car accident on Little Richmond and it's on fire. It's in the woods. I know he passed me probably going about a good 100 miles per hour." During the call, Canady also advised the 9-1-1 operator that there was a baby in one of the vehicles.

{¶ 10} Kimberly Moore, a resident who lived near the intersection of Olive and Little Richmond Roads, testified that on the day of the accident, she was walking her dog when she heard a loud explosion and saw a vehicle flying into pieces. Moore testified that the vehicle was so high in the air that she could see it over the top her next-door neighbor's roof. Moore testified that she did not recall hearing any brakes or screeching of tires. Moore testified that she immediately called 9-1-1 while her boyfriend ran toward the front of their driveway. Moore testified that when her boyfriend came back, he told her that there was a baby in one of the vehicles. Moore also testified to seeing a young woman jump out of an SUV and pace up and down the street while frantically screaming: "It's my fault; I should have told him no." Trial Tr. Vol. I, p. 44.

{¶ 11} Lieutenant Michael Snyder of the Trotwood Fire Department was the first officer to arrive at the scene of the accident. Lt. Snyder testified that when he arrived, he saw a vehicle off to the left of the road on its side against a pole and another vehicle in the woods fully engulfed in flames. Lt. Snyder testified that he and another officer made their way into the woods and extinguished the flames coming from the vehicle that was on fire. After doing so, Lt. Snyder observed two victims inside the vehicle who were charred beyond recognition. Snyder testified that a third person, Ward, was found

approximately 20 yards from the vehicle and that Ward had a broken leg.

{¶ 12} Continuing, Lt. Snyder testified that he observed a female lying halfway out of the other vehicle and that she showed no signs of life. Lt. Snyder testified that he became concerned upon observing a child safety seat in the female's vehicle. However, shortly after observing the safety seat, Lt. Snyder saw a bystander walking with the child who had been in the vehicle. Lt. Snyder testified that the child was given to a medic and taken to Dayton Children's Hospital. In addition, Lt. Snyder identified photos of the accident scene, which were taken by Trooper Alexander Davis of the State Highway Patrol. Tpr. Davis testified at trial and confirmed that he had taken the photographs in question and that he had helped prepare a basic field sketch of the accident scene.

{¶ 13} Coroner Lee Lehman testified to performing autopsies on the three victims who died in the accident. Lehman testified that Leah Smith had several broken bones and internal injuries and that her cause of death was a fracture to the base of her skull, which severed her brainstem. Lehman testified that Stephens had a ruptured liver and that his cause of death was a torn aorta of the heart. Lehman testified that Wilson had fractures in his femur and spine, liver lacerations, and a fatal head trauma that caused bleeding over the surface of his brain. Lehman further testified that the victims' injuries were consistent with a highway-speed collision.

{¶ 14} Officer Sherri Jackson, who had also testified at the suppression hearing, confirmed that the speed limit on Olive Road was 35 miles per hour and 45 miles per hour on Little Richmond Road. Ofc. Jackson also testified regarding her interview with Ward on July 29, 2020, at his residence. An audio-recording of the interview was played for

the jury and admitted into evidence as State's Exhibit 68(A). On the recording, Ward said that the traffic light at the intersection in question went from green to yellow as he approached, and that the light was yellow as he went through the intersection. Ward also told Ofc. Jackson that he had never driven in the oncoming traffic lane, had not been speeding when he went through the intersection, and had not seen the other vehicle coming from Little Richmond Road. Ward also indicated that he, Stephens, and Wilson had been singing, dancing, and having fun in the vehicle immediately before the accident.

{¶ 15} Trooper Jaysen Kelly of the State Highway Patrol, an expert traffic accident reconstructionist who prepared a crash reconstruction report on the accident in question, testified that he had used a piece of survey equipment known as a Trimble Total Station to create profiles of the accident scene and the vehicles. According to Tpr. Kelly, those profiles helped him determine the vehicles' "crush damage." Trial Tr. Vol. II, p. 238. Tpr. Kelly also testified that his calculations established that, at the time of the accident, Ward had been traveling within a range of 70.02 to 78.96 miles per hour, and that Leah Smith had been traveling within in a range of 40.5 to 45.6 miles per hour. *Id.* at 259-262. Tpr. Kelly also testified that, even without using any mathematical or scientific calculations, his experience and common sense led him to believe that the accident involved a high rate of speed.

{¶ 16} Ward testified that he accepted the accuracy of the speeds testified to by Tpr. Kelly and thus admitted to speeding during the accident. Ward testified that he had told Ofc. Jackson that he was not speeding during his interview with her because he had been in denial. Ward also stipulated to the fact that his learner's permit for driving had

been suspended and that he had had no driving privileges at the time of the accident. Regarding the accident, Ward testified that he had passed Combs on Olive Road while she slowed down and turned right onto Little Richmond Road. Ward claimed that Stephens had told him to go straight through the Olive and Little Richmond intersection and that he did not remember anything else from that point on.

{¶ 17} On cross-examination, Ward acknowledged that traffic laws require motorists to follow the speed limit, stop at red lights, and stay in the correct lane of travel. Ward also acknowledged that failing to follow those traffic laws could result in an accident and people getting injured or killed. Ward, however, claimed that those dangers had slipped his mind and that he had not thought he was putting himself or others in danger because he had looked both ways and had not seen the other vehicle coming.

{¶ 18} After considering the foregoing testimony and exhibits, the jury found Ward guilty on all three counts of aggravated vehicular homicide. Pursuant to the Reagan Tokes Act, the trial court ordered Ward to serve an aggregate, mandatory minimum term of 24 years in prison to a maximum term of 28 years in prison. The trial court also ordered Ward to pay restitution and suspended his driving privileges for life.

{¶ 19} Ward appeals from his conviction, raising four assignments of error for review. For purposes of clarity, we will address Ward's assignments of error out of order.

**Second Assignment of Error**

{¶ 20} Under his second assignment of error, Ward contends that the trial court erred by failing to grant his motion to suppress the statements he made during his

interviews with Tpr. Jones and Ofc. Jackson. Ward contends that his statements to the officers should have been suppressed because the officers had not advised him of his *Miranda* rights before questioning him.

*Standard of Review and Miranda*

{¶ 21} When ruling on a motion to suppress, a trial court "assumes the role of the trier of fact, and, as such, is in the best position to resolve questions of fact and evaluate the credibility of the witnesses." (Citation omitted.) *State v. Retherford*, 93 Ohio App.3d 586, 592, 639 N.E.2d 498 (2d Dist.1994). As a result, when we review suppression decisions, "we are bound to accept the trial court's findings of fact if they are supported by competent, credible evidence. Accepting those facts as true, we must independently determine as a matter of law, without deference to the trial court's conclusion, whether they meet the applicable legal standard." *Id.*

{¶ 22} In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the United States Supreme Court adopted procedural safeguards to secure the Fifth Amendment's constitutional guarantee against self-incrimination. *State v. Hudson*, 2d Dist. Montgomery No. 29333, 2022-Ohio-3253, ¶ 30; *In re M.H.*, 163 Ohio St.3d 93, 2020-Ohio-5485, 168 N.E.3d 439, ¶ 18. "*Miranda* requires police to give a suspect certain prescribed warnings before [a] custodial interrogation commences and provides that if the warnings are not given, any statements elicited from the suspect through police interrogation in that circumstance must be suppressed." *State v. Petitjean*, 140 Ohio App.3d 517, 523, 748 N.E.2d 133 (2d Dist.2000). In other words, if "*Miranda* warnings

are not given prior to a custodial interrogation, the prosecution may not use the statements obtained from the suspect at trial." *In re M.H.* at ¶ 18, citing *Miranda* at 444.

{¶ 23} "Police, however, are not required to administer *Miranda* warnings to every person they question, even if the person being questioned is a suspect." *Hudson* at ¶ 31, citing *State v. Biros*, 78 Ohio St.3d 426, 440, 678 N.E.2d 891 (1997), citing *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977). "Rather, *Miranda* warnings are required only for custodial interrogations[.]" *Id.*, citing *State v. Moody*, 2012-Ohio-3390, 974 N.E.2d 1273, ¶ 12 (2d Dist.). Custodial interrogation is " 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.' " *State v. Roberts*, 32 Ohio St.3d 225, 226, 513 N.E.2d 720, fn. 1 (1987), quoting *Miranda* at 444.

{¶ 24} "Determining whether questioning is 'a custodial interrogation requiring *Miranda* warnings demands a fact-specific inquiry that asks whether a reasonable person in the suspect's position would have understood himself or herself to be in custody while being questioned.' " *State v. Myers*, 154 Ohio St.3d 405, 2018-Ohio-1903, 114 N.E.3d 1138, ¶ 57, quoting *Cleveland v. Oles*, 152 Ohio St.3d 1, 2017-Ohio-5834, 92 N.E.3d 810, ¶ 21. Such an inquiry "focuses upon how a reasonable person in the suspect's position would have understood the situation." *State v. Ferguson*, 2017-Ohio-7930, 98 N.E.3d 987, ¶ 70 (2d Dist.), citing *Berkemer v. McCarty*, 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). "[N]either the subjective intent of the officer, nor the subjective belief of the defendant is relevant." *State v. Hatten*, 186 Ohio App.3d 286, 2010-Ohio-499, 927 N.E.2d 632, ¶ 50 (2d Dist.), citing *State v. Estepp*, 2d Dist. Montgomery No. 16279, 1997

WL 736501, *4 (Nov. 26, 1997). (Other citation omitted.)

{¶ 25} " 'The factors a court should consider in applying this reasonable person test include whether the encounter takes place in surroundings that are familiar to the suspect; the number of law enforcement officers present, as well as their conduct and demeanor; the degree of physical restraint imposed; and the duration and character of the interrogation.' " *State v. Magnone*, 2016-Ohio-7100, 72 N.E.3d 212, ¶ 23 (2d Dist.), quoting *State v. Farrell*, 2d Dist. Miami No. 99-CA-24, 1999 WL 812249, *3 (Oct. 8, 1999). Other factors that may be considered are: 1) the location where the questioning took place; 2) whether the defendant was a suspect when the interview began; 3) any restrictions on the defendant's freedom to leave; 4) whether the defendant was handcuffed or was told he was under arrest; 5) whether threats were made during the interrogation; 6) whether the defendant was physically intimidated during the interrogation; 7) whether the police verbally dominated the interrogation; 8) the defendant's purpose for being at the location of the questioning; 9) whether neutral parties were present at any point during the questioning; and 10) whether police took any action to overpower, trick, or coerce the defendant into making a statement. *Estepp* at *4.

*Interview at Hospital with Tpr. Jones*

{¶ 26} Ward asserts that his interview with Tpr. Jones at the hospital amounted to a custodial interrogation and that Tpr. Jones' undisputed failure to give *Miranda* warnings before the interview rendered the statements he made during the interview inadmissible. Ward claims that the interview with Tpr. Jones amounted to a custodial interrogation

because Tpr. Jones "summoned" him for questioning while he was lying in a hospital bed. According to Ward, his injury, a broken leg, restricted his freedom of movement and prevented him from having the ability to leave the interview. Ward further claims that he was physically intimidated by Tpr. Jones, who was armed and in uniform while standing over his bed questioning him. Ward claims that all these factors would have led a reasonable person in his position to believe that he had been in custody during the interview. We disagree.

{¶ 27} "Ohio courts have found police questioning of individuals in the hospital, *at times*, to be custodial in nature." (Emphasis added.) *State v. Smith*, 2d Dist. Miami No. 1995-CA-17, 1996 WL 239823, *5, citing *State v. Main*, 5th Dist. Stark No. CA 9562, 1994 WL 477751, (Aug. 22, 1994); *State v. White*, 4th Dist. Athens No. 1230, 1986 WL 6048, (May 23, 1986). This court, however, has recognized that, unlike a police station, a hospital is "a place an individual would normally feel free to leave[.]" *Estepp,* 2d Dist. Montgomery No. 16279, 1997 WL 736501, at *5. *Accord State v. Lewis*, 2d Dist. Montgomery No. 18098, 2000 WL 1867568, *4 (Dec. 22, 2000). This court has also recognized that confinement in a hospital bed does not necessarily " 'amount to a coercive environment or rise to the degree or level of restraint on freedom of movement generally associated with a formal arrest.' " *Smith* at *5, quoting *State v. Shipley*, 12th Dist. Butler No. CA84-01-012, 1984 WL 3451, *3 (Oct. 22, 1984).

{¶ 28} In *State v. Pyle*, 2d Dist. Greene No. 2003-CA-35, 2003-Ohio-6664, this court found no custodial interrogation under circumstances where an investigating officer interviewed the defendant in a hospital room while the defendant was strapped to a

backboard and wearing a neck brace. *Id.* at ¶ 7, 21-23. We reached this conclusion because the defendant "was not brought to the hospital by [the investigating officer] for questioning, but was brought by medics for treatment of his injuries." *Id.* at ¶ 22. Because the defendant was not restrained by the investigating officer, "but was restrained for medical treatment due to his injuries[,]" we found that there was "nothing in the record to indicate that [the defendant] was not free to leave the room due to [the investigating officer], or that [the investigating officer] did anything to prevent [the defendant] from leaving the room." *Id. See also Smith* at \*5; *Lewis* at \*4. Accordingly, we found no custodial interrogation and thus no *Miranda* violation. *Pyle* at ¶ 23.

{¶ 29} The present case is analogous to *Pyle*, as Ward was taken to the hospital by medics for purposes of receiving medical treatment for his broken leg and other injuries, not for police questioning. Moreover, there is nothing in the record indicating that Tpr. Jones did anything to restrict Ward's freedom of movement while questioning him at the hospital. Simply because Ward was confined to a hospital bed and unable to freely move about due to his injuries does not mean that he was in custody for purposes of *Miranda*. *See Smith* at \*5; *Shipley* at \*3.

{¶ 30} Furthermore, Ward's claim that Tpr. Jones "summoned" him for questioning is unsupported by the record. While no specific finding was made by the trial court on this matter, the record of the suppression hearing establishes that Tpr. Jones asked hospital staff to take him to Ward's hospital room, where Tpr. Jones then introduced himself to Ward and explained his reason for being there, i.e., to ask questions about the traffic accident. Suppression Tr., p. 11, 16, and 19. Nothing in the record indicates that

Ward was brought to Tpr. Jones for questioning. Instead, the record establishes that Tpr. Jones sought out Ward with the help of hospital staff, which is similar to the circumstances in *Pyle*. *See Pyle* at ¶ 7, 21-23.

{¶ 31} In addition, Ward's claim that Tpr. Jones was physically intimidating during the interview is unpersuasive. As previously discussed, this claim is based merely on the fact that Tpr. Jones was armed and in uniform while standing over Ward's bed to question him. Because Ward was confined to his bed and because officers like Tpr. Jones typically wear uniforms and carry weapons while on duty, we do not find that those attributes would have caused a reasonable person in Ward's position to believe that he was in custody. This is especially true since the trial court found that Tpr. Jones never drew his weapon during the interview and never told Ward that he was under arrest.

{¶ 32} The trial court also found that the interview with Tpr. Jones lasted only 10 or 15 minutes and that Tpr. Jones wrote down all the questions and answers from the interview. The written questions and answers were admitted into evidence during the suppression hearing, and they established that the interview was restricted to 11 straightforward questions pertaining to the accident, the occupants in Ward's vehicle, and whether Ward had been under the influence of drugs or alcohol. *See* Suppression Exhibit No. 5. Accordingly, there is nothing in the record indicating that Tpr. Jones threatened or coerced Jones during the interview. In fact, the trial court found that Tpr. Jones did not even know if Ward was a criminal suspect at the time of the interview and that Ward was free to terminate the interview.

{¶ 33} Upon review, we find that the trial court's findings were supported by

competent, credible evidence in the record. Based on those findings, we cannot say that a reasonable person in Ward's position would have felt that he was in custody at the time he was questioned by Tpr. Jones. Accordingly, there was no custodial interrogation for which Tpr. Jones was required to give *Miranda* warnings. Because there was no custodial interrogation, the trial court did not err by failing to suppress the statements that Ward made to Tpr. Jones at the hospital.

*Interview at Ward's Residence with Ofc. Jackson and Tpr. Ambers*

{¶ 34} Ward also asserts that his interview with Ofc. Jackson and Tpr. Ambers at his residence amounted to a custodial interrogation for which *Miranda* warnings were required. We again disagree.

{¶ 35} "In general, questioning by law enforcement officers is less likely to rise to the level of a custodial interrogation when it occurs in a defendant's home." (Citations omitted.) *State v. Martinez*, 8th Dist. Cuyahoga Nos. 103572, 103573, 2016-Ohio-5515, ¶ 23. "The courts of this state have generally found that an individual is not in custody when questioning takes place in the individual's home and the individual is free to move about and is questioned by an officer over a brief period of time." *State v. Chenoweth*, 2d Dist. Miami No. 2010-CA-14, 2011-Ohio-1276, ¶ 7. *See also State v. Preztak*, 181 Ohio App.3d 106, 2009-Ohio-621, 907 N.E.2d 1254, ¶ 24 (8th Dist.) (no custodial interrogation where officers knocked on defendant's door, defendant invited officers into her home for questioning, officers did not handcuff or restrain the defendant, and defendant never made an attempt to end the interview). "This is because a person's

home is a place that 'a reasonable person would have felt free to terminate the interview[.]' " *State v. Griffith*, 8th Dist. Cuyahoga No. 97366, 2012-Ohio-2628, ¶ 19, quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664-665, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004).

**{¶ 36}** However, "Ohio courts have found that the 'inherently coercive' atmosphere of a custodial interrogation can occur even if a suspect is questioned in his home *if he is thereby 'deprived of his freedom of action in a significant way.'* " (Emphasis added.) *State v. Sevrence*, 6th Dist. Fulton No. F-96-001, 1997 WL 89100, *5 (Feb. 28, 1997), quoting *State v. Steers*, 2d Dist. Greene No. 1989-CA-38, 1991 WL 82974, *3 (May 14, 1991), citing *Orozco v. Texas,* 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969). That, however, was not the case here.

**{¶ 37}** In this case, the trial court found that Ward's interview with Ofc. Jackson and Tpr. Ambers took place at Ward's residence. The trial court also found that Ward's younger brother answered the door and let the officers inside the residence after Ward invited the officers to talk with him inside his bedroom. Based on the audio-recorded interview, the trial court additionally found that the interview lasted approximately 20 minutes and was conversational in nature. The trial court further found that Ward was coherent, upbeat, and happy during the interview. In addition, the trial court found that Ward never asked to end the interview, was not placed under arrest or detained, and the officers did not make any promises or threaten Ward.

**{¶ 38}** Upon review, we find that all the trial court's findings were supported by competent, credible evidence in the record. Based on those findings, we cannot say that

Ward was in custody or that he was deprived of his freedom in any significant way during the interview at his residence. In so holding, we note that Ward's freedom of movement was restricted only by his broken leg, not by the officers. The officers never confined Ward or prevented him from moving about while they were questioning him.

{¶ 39} For the foregoing reasons, we cannot say that a reasonable person in Ward's position would have believed that he was in custody during the interview at his residence. Accordingly, there is no basis to conclude that there was a custodial interrogation. Because there was no custodial interrogation, the trial court did not err by failing to suppress the statements that Ward made to Ofc. Jackson and Tpr. Ambers at his residence.

{¶ 40} Ward's second assignment of error is overruled.

**Third Assignment of Error**

{¶ 41} Under his third assignment of error, Ward contends that his convictions for three counts of aggravated vehicular homicide were against the manifest weight of the evidence. We disagree.

{¶ 42} "A weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." (Citation omitted.) *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 12. When evaluating whether a conviction is against the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine

whether, in resolving conflicts in the evidence, the trier of fact " 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). "The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence." *State v. Adams*, 2d Dist. Greene Nos. 2013-CA-61, 2013-CA-62, 2014-Ohio-3432, ¶ 24, citing *Wilson* at ¶14. A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin* at 175.

{¶ 43} Pursuant to Ohio's aggravated vehicular homicide statute, R.C. 2903.06(A)(2)(a), the State was required to prove that Ward recklessly caused the death of another while operating a motor vehicle. Because there was no dispute that Ward had been driving at the time of the accident in question and that the accident had caused the deaths of Stephens, Wilson, and Smith, the only element at issue was whether Ward had been reckless.

{¶ 44} "A person acts recklessly when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that the person's conduct is likely to cause a certain result or is likely to be of a certain nature." R.C. 2901.22(C). Excessive speed by itself does not constitute recklessness for purposes of supporting a conviction for aggravated vehicular homicide. *See State v. Skaggs*, 185 Ohio App.3d 752, 2010-Ohio-302, 925 N.E.2d 676, ¶ 46-47 (2d Dist.); *State v. Whitaker*, 111 Ohio App.3d 608, 611-612, 676 N.E.2d 1189 (6th Dist.1996); *State v. Moore*, 2d Dist.

Montgomery No. 22904, 2009-Ohio-3766, ¶ 8. "Rather, it is one factor to consider, along with all of the other evidence, in determining recklessness." *Skaggs* at ¶ 47.

{¶ 45} In this case, E'Mariha Combs, Emerson Combs, and Karrie Canady testified to having seen Ward exceeding the speed limit, weaving into the oncoming traffic lane to pass vehicles, and running the red light, which led to the fatal collision at the intersection of Olive and Little Richmond Roads. The photographic evidence and the testimony given by the responding fire and police officers regarding the condition and placement of the vehicles after the collision also supported the conclusion that the accident was the result of a high-speed collision. The expert testimony given by accident reconstructionist Tpr. Kelly further established that Ward had been traveling within a range of 70.02 to 78.96 miles per hour in a 35 mile per hour zone.

{¶ 46} In addition, Ward admitted to exceeding the speed limit in the range testified to by Tpr. Kelly and stipulated to the fact that he had had no driving privileges at the time of the accident. In addition, Ward acknowledged that traffic laws require drivers to follow the speed limit, stay in the correct lane of travel, and to stop at red lights. Ward further acknowledged that failing to abide by those traffic laws could result in someone getting injured or killed.

{¶ 47} After reviewing the entire record, weighing the evidence and all reasonable inferences, and considering witness credibility, we cannot say that the evidence weighed heavily against convicting Ward of the three counts of aggravated vehicular homicide; there was ample evidence presented at trial establishing that Ward recklessly caused the deaths of the three victims while operating a motor vehicle. The evidence overwhelmingly

established that Ward had been reckless because it showed that Ward had traveled over twice the speed limit, had woven into the oncoming traffic lane to pass cars, and had run a red light at an intersection, all while being an unlicensed driver and knowing that such traffic violations could result in someone's getting injured or killed. Accordingly, Ward's claim that his convictions were against the manifest weight of the evidence lacks merit.

{¶ 48} Ward's third assignment of error is overruled.

## First Assignment of Error

{¶ 49} Under his first assignment of error, Ward contends that his trial counsel provided ineffective assistance by: (1) asking questions during his direct examination that reiterated and validated the damaging evidence concerning the high rate of speed at which he had been traveling; (2) failing to object to Tpr. Kelly's testimony regarding his use of the Trimble Total Station; and (3) failing to object to certain comments made by the prosecutor during closing argument.

### Standard of Review

{¶ 50} To succeed on an ineffective assistance claim, a defendant must establish: (1) his trial counsel's performance was deficient; and (2) the deficient performance prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), paragraph two of the syllabus; *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraph two of the syllabus. To establish deficient performance, a defendant must show that his trial counsel's performance fell below an objective standard

of reasonable representation. *Strickland* at 688; *Bradley* at 142. To establish prejudice, a defendant must show that there is "a reasonable probability that, but for counsel's errors, the proceeding's result would have been different." *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 204, citing *Strickland* at 687-688 and *Bradley* at paragraph two of the syllabus. The failure to make a showing of either deficient performance or prejudice defeats a claim of ineffective assistance of counsel. *Strickland* at 697.

{¶ 51} In reviewing ineffective assistance claims, " 'we will not second-guess trial strategy decisions, and "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." ' " *State v. English*, 2d Dist. Montgomery No. 26337, 2015-Ohio-1665, ¶ 10, quoting *State v. Mason*, 82 Ohio St.3d 144, 157-158, 694 N.E.2d 932 (1998), quoting *Strickland* at 689. Therefore, " 'trial counsel is allowed wide latitude in formulating trial strategy[.]' " *State v. Collins*, 2d Dist. Miami No. 2010-CA-22, 2011-Ohio-4475, ¶ 15, quoting *State v. Olsen*, 2d Dist. Clark No. 2009-CA-110, 2011-Ohio-3420, ¶ 121. "Debatable strategic and tactical decisions may not form the basis of a claim for ineffective assistance of counsel, even if, in hindsight, it looks as if a better strategy had been available." *State v. Conley*, 2015-Ohio-2553, 43 N.E.3d 775, ¶ 56 (2d Dist.), citing *State v. Cook*, 65 Ohio St.3d 516, 524-525, 605 N.E.2d 70 (1992).

*Counsel's Questioning of Ward on Direct Examination*

{¶ 52} Ward first contends that his trial counsel provided ineffective assistance

during his direct examination because counsel asked questions that reiterated and ultimately confirmed the high rate of speed at which he had been traveling at the time of the accident.   Specifically, Ward takes issue with the following line of questioning:

Q.    And you heard testimony about – both from witnesses and from an – the expert, as far as [Combs'] speed and your speed.   As you sit here today, do you accept that that's accurate?

A.    Yes.

Q.    When you were talking to the officer, we heard it on the tape there that you didn't tell the officer you were doing 60 or 70, whatever the speed was.

A.    Correct.

Trial Tr. Vol. II, p. 303-304.   According to Ward, the foregoing line of questioning prejudiced him because it needlessly corroborated damaging testimony offered by the State and negated the defense he gave to police during his interview, i.e., that he had not been speeding.

{¶ 53} "In general, the manner of questioning a witness is a matter of trial strategy." (Citation omitted.)   *State v. Martin*, 10th Dist. Franklin No. 05AP-495, 2006-Ohio-4229, ¶ 20, citing *State v. Singh*, 157 Ohio App.3d 603, 2004-Ohio-3213, 813 N.E.2d 12, ¶ 43 (7th Dist.); *State v. Schooler*, 2d Dist. Montgomery No. 24488, 2011-Ohio-6108, ¶ 17 ("whether to ask [a witness] particular questions is a matter of sound trial strategy"); *State v. Barnhart*, 6th Dist. Huron No. H-10-005, 2011-Ohio-2693, ¶ 44 ("[t]he scope and nuances of how a particular witness is questioned fall within the ambit of trial strategy").

As previously discussed, a debatable decision concerning trial strategy cannot form the basis of an ineffective assistance of counsel claim. *Cook*, 65 Ohio St.3d 516, 524-525, 605 N.E.2d 70.

{¶ 54} In this case, the way in which counsel conducted his direct examination of Ward was a matter of trial strategy. Given the overwhelming evidence establishing that Ward was speeding, Ward's trial counsel may have strategically decided to question Ward in a manner that allowed Ward to admit he was speeding as a means to boost his credibility in the eyes of the jury. It is important to note that Ward's admission to speeding was not fatal to his case. This is because the primary issue for trial was whether Ward was reckless at the time of the accident, and, as previously discussed, excessive speed by itself does not constitute recklessness for purposes of supporting a conviction for aggravated vehicular homicide. *Skaggs*, 185 Ohio App.3d 752, 2010-Ohio-302, 925 N.E.2d 676, at ¶ 46-47; *Whitaker*, 111 Ohio App.3d 608 at 611-612, 676 N.E.2d 1189.

{¶ 55} Because counsel's line of questioning was a matter of trial strategy, Ward's ineffective assistance claim as it relates to his direct examination lacks merit.

*Failure to Object to Trimble Total Station Testimony*

{¶ 56} Ward next claims that his trial counsel provided ineffective assistance by failing to object to Tpr. Kelly's testimony regarding his use of a surveying instrument known as a Trimble Total Station. Tpr. Kelly testified to using a Trimble Total Station to shoot profiles of the accident scene and the vehicles in order to measure the vehicle "crush damage." Trial Tr. Vol. III, p. 238. Ward claims that his trial counsel should have

objected to the testimony that flowed from Tpr. Kelly's use of the Trimble Total Station, because proper foundation was not laid as to the instrument's reliability or its purpose.

{¶ 57} Even if we were to find that counsel's failure to object to the testimony at issue constituted deficient performance, Ward cannot establish any resulting prejudice. This is because even if Tpr. Kelly's testimony pertaining to the Trimble Total Station had been prohibited on objection, there was other ample evidence establishing Ward's reckless conduct at the time of the accident, i.e., the eyewitness testimony, Ward's admission to speeding, and his stipulation to being an unlicensed driver. In other words, Tpr. Kelly's expert testimony pertaining to the Trimble Total Station was not vital to Ward's conviction, and its absence would not have changed the outcome of Ward's trial. Because the outcome of Ward's trial would not have been different had his trial counsel objected to Tpr. Kelly's testimony, Ward cannot establish any prejudice. Accordingly, Ward's ineffective assistance of counsel claim relating to that testimony lacks merit.

*Failure to Object to Comments During the State's Closing Argument*

{¶ 58} Ward further claims that his trial counsel provided ineffective assistance by failing to object to the following comments made by the prosecutor during closing argument:

Defendant ignored all of these risks, stuck his head in the sand and flew through that intersection at the red light thinking he was invincible. And you know what? He survived. * * * Mike and Elgin were trapped in a one and a half ton missile careening through that intersection in to Leah

Smith's car.

Trial Tr. Vol. III at 345.

[During his police interview, Ward] not only tells the officer about [the music in the car and bopping around in the car] two weeks after he kills three people, but he's laughing about it and dancing around and showing the officer how he was dancing along with the music, too.

*Id.* at 364.

{¶ 59} Also, after mentioning that Ward was an unlicensed driver who drove at least two times over the legal speed limit, wove in and out of traffic, and ran a red light without trying to stop or slow down, the prosecutor said: "I would have a hard time suggesting something that would make him more reckless. I guess maybe if he was taking a selfie while doing it?" *Id.* at 357.

{¶ 60} Ward claims that the foregoing comments by the prosecutor were improper because their purpose was to inflame the emotions of the jurors. Ward also claims that his trial counsel performed deficiently by failing to object to the comments and that said deficient performance prejudiced him. We disagree.

{¶ 61} Prosecutors are afforded wide latitude in the presentation of closing arguments. *State v. Arrone*, 2d Dist. Greene No. 2005-CA-89, 2006-Ohio-4144, ¶ 126; *State v. Lott*, 51 Ohio St.3d 160, 165, 555 N.E.2d 293 (1990). They may comment freely on " 'what the evidence has shown and what reasonable inferences may be drawn therefrom.' " *Lott* at 165, quoting *State v. Stephens*, 24 Ohio St.2d 76, 82, 263 N.E.2d (1970). *Accord State v. Baker*, 159 Ohio App.3d 462, 2005-Ohio-45, 824 N.E.2d 162,

¶ 19 (2d Dist.). "Both parties * * * may be 'colorful or creative' [during closing arguments] but not purely abusive, inflammatory, or purely derogatory." *State v. Whitaker*, Ohio Slip Opinion No. 2022-Ohio-2840, __ N.E.3d __, ¶ 96, quoting *State v. Brown*, 38 Ohio St.3d 305, 317, 528 N.E.2d 523 (1988).

{¶ 62} In this case, the comments at issue can certainly be described as colorful and creative, as they were clearly designed to hold the attention of the jurors. The comments, however, were not purely abusive or inflammatory, but firmly rooted in the evidence presented at trial. *See Arrone* at ¶ 127. Accordingly, we do not find that the State's comments were improper. Because the comments were not improper, we do not find that Ward's trial counsel performed deficiently by failing to object to them.

{¶ 63} Even if we had found that counsel's performance was deficient for failing to object to the prosecutor's comments, Ward cannot establish that the outcome of his trial would have been different had his counsel objected. The evidence presented at trial overwhelmingly established that Ward was guilty of aggravated vehicular homicide. Moreover, the trial court specifically advised the jury that closing arguments were not to be considered as evidence. Trial Tr. Vol. III, p. 338. Therefore, because Ward failed to establish both deficient performance and prejudice, his ineffective assistance claim relating to the prosecutor's comments during closing argument lacks merit.

{¶ 64} Because all of Ward's ineffective assistance of counsel claims lack merit, his first assignment of error is overruled.

**Fourth Assignment of Error**

{¶ 65} Under his fourth assignment of error, Ward contends that he was denied a fair trial due to the State's engaging in prosecutorial misconduct during closing argument. In support of this claim, Ward relies on the same comments that he challenged under the foregoing assignment of error and once again claims that the State's comments were excessively emotional and inflammatory. We, however, disagree.

{¶ 66} "The test for prosecutorial misconduct is whether remarks were improper and, if so, whether they prejudicially affected substantial rights of the accused." *State v. Jones*, 90 Ohio St.3d 403, 420, 739 N.E.2d 300 (2000), citing *State v. Smith*, 14 Ohio St.3d 13, 14, 470 N.E.2d 883 (1984). "The touchstone of the analysis 'is the fairness of the trial, not the culpability of the prosecutor.' " *State v. Garrett*, Ohio Slip Opinion No. 2022-Ohio-4218, __ N.E.3d __, ¶ 144, quoting *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982). "Where it is clear beyond a reasonable doubt that a jury would have found the defendant guilty even absent the alleged misconduct, the defendant has not been prejudiced, and his conviction will not be reversed." *State v. Stevenson*, 2d Dist. Greene No. 2007-CA-51, 2008-Ohio-2900, ¶ 42, citing *State v. Loza*, 71 Ohio St.3d 61, 78, 641 N.E.2d 1082 (1994).

{¶ 67} As previously discussed, prosecutors are afforded wide latitude in the presentation of closing arguments. *Arrone*, 2d Dist. Greene No. 2005-CA-89, 2006-Ohio-4144, at ¶ 126; *Lott*, 51 Ohio St.3d at 165, 555 N.E.2d 293. "For a prosecutor's closing argument to be prejudicial, the remarks must be 'so inflammatory as to render the jury's decision a product solely of passion and prejudice.' " *Arrone* at ¶ 126, quoting *State v. Williams*, 23 Ohio St.3d 16, 20, 490 N.E.2d 906 (1986). " 'Even if the

prosecutor's statements during closing arguments are improper, reversal based upon those statements is warranted only if the statements permeate the entire atmosphere of the trial.' " *Id.*, quoting *State v. Tumbleson*, 105 Ohio App.3d 693, 699, 664 N.E.2d 1318 (12th Dist.1995).

**{¶ 68}** In this case, because Ward failed to object to any of the State's comments at issue, his prosecutorial misconduct claim will be reviewed for plain error. In order to prevail under a plain-error review, Ward must establish both that misconduct occurred and that but for the misconduct, the outcome of his trial clearly would have been different. *State v. Mammone*, 139 Ohio St.3d 467, 2014-Ohio-1942, 13 N.E.3d 1051, ¶ 111, citing *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002).

**{¶ 69}** Under the previous assignment of error, we already determined that the prosecutor's comments during closing argument were not improper because they were rooted in the evidence presented at trial and were not purely abusive or inflammatory. Ward also cannot establish that the outcome of his trial would have been different but for the comments, as there was overwhelming evidence establishing the three counts of aggravated vehicular homicide. Accordingly, Ward was not prejudicially affected by the State's comments and thus cannot establish prosecutorial misconduct or plain error.

**{¶ 70}** Ward's fourth assignment of error is overruled.

## Conclusion

**{¶ 71}** Having overruled all four assignments of error raised by Ward, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

EPLEY, J. and LEWIS, J., concur.