[Cite as *State v. Logsdon*, 2025-Ohio-298.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellant | : | C.A. No. 30290 |
| | : | |
| v. | : | Trial Court Case Nos. 2024-CRB-00209; 2024-TRD-000326 |
| | : | |
| JERRY LOGSDON | : | |
| | : | (Criminal Appeal from Municipal Court) |
| Appellee | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on January 31, 2025

. . . . . . . . . . .

MARK T. ROSS, Attorney for Appellant

ARVIN S. MILLER, Attorney for Appellee

. . . . . . . . . . . .

TUCKER, J.

{¶ 1} Plaintiff-appellant State of Ohio appeals from an order of the Dayton Municipal Court that granted defendant-appellee Jerry Logsdon's pretrial motion to suppress evidence. For the reasons set forth below, we reverse and remand.

## I.     Factual and Procedural History

{¶ 2} On December 28, 2022, Logsdon was involved in a motor vehicle collision on Wayne Avenue; a pedestrian was killed, and Logsdon sustained serious injuries. Following the collision, Logsdon was transported to Miami Valley Hospital, and he underwent surgery the next day.   On January 3, 2023, Dayton Police Department Detective Christopher Jordan went to the hospital to interview Logsdon.

{¶ 3} On January 23, 2024, Logsdon was charged with vehicular homicide, vehicular manslaughter, failure to control, and speeding.   He filed a motion to suppress his statements to Det. Jordan during the hospital interview.   A hearing on the motion was conducted on June 12, 2024.   Jordan testified regarding the interview. The State introduced the video of the interview retrieved from Jordan's body camera, which was worn and operating during the hospital interview.

{¶ 4} The video began with Jordan walking down the hallway of the hospital toward Logsdon's room.   Jordan knocked on the door and was invited in.   As Jordan walked into the room, Logsdon was laying, slightly inclined, in the bed, and he was using the hospital telephone.   A woman, who was identified only as Logsdon's friend, was also in the room, and she remained in the room for the entire interview.

{¶ 5} Jordan immediately introduced himself and indicated he was there to investigate the collision.   Jordan asked Logsdon if he was able to speak with him. Logsdon replied, "good timing," and indicated that he was on the phone with his mother. He then hung up the landline and instructed his friend to call his mother on her cell phone.

The mother then was connected, on speaker, for the entirety of the interview.

{¶ 6} Logsdon immediately began speaking and stated, "the news said it was my fault." He then denied responsibility for the collision and claimed that a "Nissan" that was "low to the ground" and had a "spoiler" had pulled in front of him and "cut [him] off." Logsdon stated that he had been able to engage his brakes but that he slid on "black ice."

{¶ 7} At that point, Jordan informed Logsdon that the crash remained under investigation. Jordon also stated that he needed to inform Logsdon of his rights before asking him any questions. On the phone, Logsdon's mother asked if Jordan was arresting her son. Jordan explained that Logsdon was not being arrested and that it was Jordan's standard procedure to explain a person's rights before questioning them. Jordon then asked Logsdon for preliminary information including his social security number, date of birth, address, phone number, and his mother's phone number. Logsdon provided the information without any hesitation and again reiterated that he was not at fault for the accident. He also stated that he had completed high school but had not graduated.

{¶ 8} Jordan provided Logsdon with a copy of a standard *Miranda* pre-interview form so that he could follow along as Jordan recited from the form. After hearing each enumerated right, Logsdon indicated his understanding of that right. Jordan then read the waiver of rights portion of the form to Logsdon, which Logsdon signed.

{¶ 9} Jordan then produced four pre-printed pages of interview questions. Each question had a space to write in Logsdon's response. As Logsdon answered the questions, Jordan filled out the pages with the information provided. Logsdon signed all

four pages. Logsdon indicated that, at the time of the collision, he was driving at the speed limit of 35 miles per hour. He indicated that he had been able to see clearly and that he did not have any vision limitations. He also indicated that he had been wearing his seat belt. According to Logsdon, he had just dropped off his mother at her home and was heading to UDF to get beer for a friend when the crash occurred. He admitted he did not have auto insurance. He stated that he had not consumed any alcohol and had not smoked any marijuana.[1] Logsdon stated that the Nissan that caused the collision had been a gray/silver color and that it had been driven by a white male. After Logsdon signed the questionnaire, Jordon answered some questions posed by Logsdon's mother. As Jordan was exiting the room, Logsdon made a joke about his injuries.

{¶ 10} The trial court sustained Logsdon's motion to suppress the statements he made during the hospital interview. Specifically, the trial court found that Logsdon had been in custody at the time of the interview because he was "bed-ridden" and attached to medical monitors. The court also found that Logsdon's waiver of his rights was not knowing, intelligent, and voluntary because he had invoked his right to an attorney and was "substantially compromised" by his "pain" and by the pain medications he was taking.

{¶ 11} The State appeals.

## II. Suppression

{¶ 12} The sole assignment of error asserted by the State is:

THE TRIAL COURT ERRED IN SUPPRESSING APPELLEE'S ORAL AND

---

[1] During the interview, Logsdon stated, without prompting, that he smoked marijuana.

WRITTEN STATEMENTS MADE TO DETECTIVE JORDAN.

{¶ 13} The State challenges the trial court's decision to suppress Logsdon's statements to Jordan. The State argues that the trial court erred in finding that Logsdon had been in custody at the time of the interview. The State further argues that the evidence did not support the court's finding that Logsdon's waiver was not made knowingly, voluntarily, and intelligently. Finally, the State contends that the court's finding that Logsdon had invoked his right to counsel was not supported on the record.

{¶ 14} We begin with by considering whether Logsdon was in police custody. In *Miranda v. Arizona*, 384 U.S. 436 (1966), the United States Supreme Court adopted procedural safeguards to secure the Fifth Amendment's constitutional guarantee against self-incrimination. *State v. Hudson*, 2022-Ohio-3253, ¶ 30 (2d Dist.). "*Miranda* requires police to give a suspect certain prescribed warnings before custodial interrogation commences and provides that if the warnings are not given, any statements elicited from the suspect through police interrogation in that circumstance must be suppressed." *State v. Petitjean*, 140 Ohio App.3d 517, 523 (2d Dist. 2000).

{¶ 15} *Miranda* warnings are required only when police conduct a custodial interrogation. *Hudson* at ¶ 31. A custodial interrogation occurs when law enforcement officers take a person "into custody or otherwise deprive [him] of his freedom of action in any significant way." *State v. Roberts*, 32 Ohio St.3d 225, 226, fn. 1 (1987), quoting *Miranda* at 444.

{¶ 16} "Determining whether questioning is 'a custodial interrogation requiring *Miranda* warnings demands a fact-specific inquiry that asks whether a reasonable person

in the suspect's position would have understood himself or herself to be in custody while being questioned.' " *State v. Myers*, 2018-Ohio-1903, ¶ 57, quoting *Cleveland v. Oles*, 2017-Ohio-5834, ¶ 21. This type of inquiry "focuses upon how a reasonable person in the suspect's position would have understood the situation." *State v. Ferguson*, 2017-Ohio-7930, ¶ 70 (2d Dist.), citing *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984).

{¶ 17} " 'The factors a court should consider in applying this reasonable person test include whether the encounter takes place in surroundings that are familiar to the suspect; the number of law enforcement officers present, as well as their conduct and demeanor; the degree of physical restraint imposed; and the duration and character of the interrogation.' " *State v. Magnone*, 2016-Ohio-7100, ¶ 23 (2d Dist.), quoting *State v. Farrell,* 1999 WL 812249, *3 (2d Dist. Oct. 8, 1999). Additional factors the court may consider include: 1) the location where the questioning took place; 2) whether the defendant was a suspect when the interview began; 3) any restrictions on the defendant's freedom to leave; 4) whether the defendant was handcuffed or was told he was under arrest; 5) whether threats were made during the interrogation; 6) whether the defendant was physically intimidated during the interrogation; 7) whether the police verbally dominated the interrogation; 8) the defendant's purpose for being at the location of the questioning; 9) whether neutral parties were present at any point during the questioning; and 10) whether police took any action to overpower, trick, or coerce the defendant into making a statement. *State v. Estepp*, 1997 WL 736501, *4 (2d Dist. Nov. 26, 1997).

{¶ 18} We have addressed the issue of police interviews conducted in hospitals. In *State v. Ward*, 2023-Ohio-328 (2d Dist.), we stated:

"Ohio courts have found police questioning of individuals in the hospital, *at times*, to be custodial in nature." (Emphasis added.) *State v. Smith,* 2d Dist. Miami No. 1995-CA-17, 1996 WL 239823, *5, citing *State v. Main*, 5th Dist. Stark No. CA 9562, 1994 WL 477751 (Aug. 22, 1994); *State v. White*, 4th Dist. Athens No. 1230, 1986 WL 6048 (May 23, 1986). This court, however, has recognized that, unlike a police station, a hospital is "a place an individual would normally feel free to leave[.]" [*State v.*] *Estepp*, 2d Dist. Montgomery No. 16279, 1997 WL 736501, at *5. *Accord State v. Lewis*, 2d Dist. Montgomery No. 18098, 2000 WL 1867568, *4 (Dec. 22, 2000). This court has also recognized that confinement in a hospital bed does not necessarily " 'amount to a coercive environment or rise to the degree or level of restraint on freedom of movement generally associated with a formal arrest.' " *Smith* at *5, quoting *State v. Shipley*, 12th Dist. Butler No. CA84-01-012, 1984 WL 3451, *3 (Oct. 22, 1984).

In *State v. Pyle*, 2d Dist. Greene No. 2003-CA-35, 2003-Ohio-6664, this court found no custodial interrogation under circumstances where an investigating officer interviewed the defendant in a hospital room while the defendant was strapped to a backboard and wearing a neck brace. Id. at ¶ 7, 21-23. We reached this conclusion because the defendant "was not brought to the hospital by [the investigating officer] for questioning, but was brought by medics for treatment of his injuries." *Id.* at ¶ 22. Because the defendant was not restrained by the investigating officer, "but was

restrained for medical treatment due to his injuries[,]" we found that there was "nothing in the record to indicate that [the defendant] was not free to leave the room due to [the investigating officer], or that [the investigating officer] did anything to prevent [the defendant] from leaving the room." *Id.* *See also Smith* at *5; *Lewis* at *4. Accordingly, we found no custodial interrogation and thus no *Miranda* violation. *Pyle* at ¶ 23.

*Ward* at ¶ 27-28.

{¶ 19} Like the defendants in *Pyle* and *Ward*, Logsdon was taken to the hospital by emergency medical technicians for the purpose of medical treatment for his injuries, rather than for police questioning. Although Logsdon was connected to medical monitors, there was no evidence that Jordan had handcuffed him to the bed or otherwise acted in any manner to restrict Logsdon's freedom to move. There was no evidence that Jordan had acted in a manner that was intimidating or that Jordan had threatened or coerced Logsdon. Logsdon's mother and friend were both present for the interview, and his mother took an active role by asking Jordan questions. A nurse was also in the room for the last few minutes of the interview. Jordan was in the hospital room for less than 30 minutes, and the actual interview lasted less than 20 minutes.

{¶ 20} On this record, we conclude there was no competent, credible evidence to support the trial court's finding that Logsdon had been in custody. As we observed in *Ward,* the mere fact that Logsdon "was confined to a hospital bed and unable to freely move about due to his injuries does not mean that he was in custody for purposes of

*Miranda*." *Ward* at ¶ 29.[2]

{¶ 21} We next address the trial court's finding that Logsdon's waiver was not made knowingly, intelligently or voluntarily. "Whether a confession is voluntary and whether a suspect has been subjected to custodial interrogation so as to require *Miranda* warnings are analytically separate issues." *State v. Kelly*, 2005-Ohio-305, ¶ 10 (2d Dist.), citing *Dickerson v. United States*, 530 U.S. 428 (2000). "The Due Process Clause requires an inquiry, separate from custody considerations, concerning whether a defendant's will was overborne by the circumstances surrounding the giving of his confession." (Citations omitted.) *Id.* "This due process test takes into consideration the totality of the surrounding facts and circumstances, including the characteristics of the accused and the details of the interrogation." *Id.* "Factors to be considered include the age, mentality, and prior criminal experience of the accused; the length, intensity and frequency of the interrogation; the existence of physical deprivation or mistreatment; and the existence of threats or inducements." *Id.* Only if the totality of the circumstances surrounding the interrogation reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that *Miranda* rights have been waived. *Moran v. Burbine*, 475 U.S. 412, 421 (1986), citing *Fare v. Michael C.*, 442 U.S. 707, 725 (1979).

{¶ 22} The record demonstrates that Logsdon was an adult with a high school education and was able to read and write.[3] The interview was short. There was nothing

---

[2] Because Logsdon was given *Miranda* warnings, his custodial status seems academic. Nonetheless, we have addressed the issue because the State's brief in support of its assignment of error asserts that the trial court's custodial finding was incorrect.

[3] The trial court incorrectly stated that Jordan failed to ascertain whether Logsdon could read or write.

on the video to indicate that Logsdon's mental status was impaired. Indeed, the record does not support the trial court's finding that Logsdon was under the influence of pain medications when the interview occurred. In fact, a nurse stood in the room for the last few minutes of the interview waiting to administer medications. Even had Logsdon been under such influence, there was no indication of confusion or inability to understand the rights as explained to him by Jordan. Logsdon answered questions quickly and appropriately, and his demeanor was consistent with a reasonably intelligent adult. The video showed that the tone throughout the interview was calm and conversational, and Jordan did not make any promises or threats or otherwise coerce Logsdon to make his statements. Logsdon's mother took part in the interview, and his friend held his hand during portions of it. Additionally, a nurse entered and exited the room freely during the first part of the interview.

{¶ 23} Appellate review of a trial court's decision on a motion to suppress evidence involves mixed questions of law and fact. *State v. Long*, 127 Ohio App.3d 328, 332 (4th Dist.1998). When ruling on a motion to suppress evidence, a trial court assumes the role of trier of fact and is in the best position to resolve questions of fact and to evaluate the credibility of witnesses. *State v. Treesh*, 90 Ohio St.3d 460, 472 (2001). Accordingly, reviewing courts must defer to the trial court's findings of fact if competent, credible evidence exists to support the findings. *State v. Dunlap,* 73 Ohio St.3d 308, 314 (1995). A reviewing court then must independently determine, without deference to the trial court, whether the trial court properly applied the substantive law to the facts of the case. *Long* at 332.

**{¶ 24}** As discussed, we normally accord great deference to the factual findings of the trial court.   However, in this case, with our ability to review and evaluate the interview video being the same as the trial court's, we conclude that the video simply did not support a finding that Logsdon was impaired by either pain or medications.   Based upon this record, we find that Logsdon's waiver of his *Miranda* rights was made in a knowing, intelligent, and voluntary manner.

**{¶ 25}** Finally, we turn to the trial court's finding that Logsdon had invoked his right to an attorney.   To "protect the Fifth Amendment privilege against self-incrimination," *Miranda* requires police to use certain procedures in dealing with accused persons. *Moran v. Burbine*, 475 U.S. 412, 420 (1986).   Importantly, before initiating questioning, the police must inform suspects of their right to have counsel present.   *Id.*

**{¶ 26}** Whether an accused has "invoked his right to counsel" involves "an objective inquiry."   *Davis v. United States*, 512 U.S. 452, 458-459 (1994). The request for counsel must be clear and unambiguous, such that "a reasonable police officer in the circumstances would understand the statement to be a request for an attorney."   *Id.* at 459.   "If a suspect's statement is not an unambiguous or unequivocal request for counsel, [an officer] [has] no obligation to stop questioning him." *Id.* at 461-62.   An officer also has no obligation to ask clarifying questions to ascertain if the suspect is attempting to invoke his right to counsel. *Id.*

**{¶ 27}** Relevant to this issue, Jordan read the following to Logsdon:

3.   You have the right to talk to a lawyer for advice before we ask you any questions and to have a lawyer with you during questioning.

4. If you do not have the money to hire a lawyer, a lawyer appointed by the Court, or a lawyer from the Public Defender's Office will be provided to you before and during questioning without any cost to you.

5. If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer.

{¶ 28} When asked if he understood each right, Logsdon answered affirmatively to the third and fifth enumerated rights. As Jordan concluded his reading of the fourth right, Logsdon stated, "that's what I need." Jordan then asked if he understood the right and Logsdon stated, "yes, sir."

{¶ 29} Contrary to the trial court's conclusion that this constituted an invocation of the right to counsel, we cannot conclude that Logsdon made a clear and unambiguous request for counsel. Instead, Logsdon's comment could have reasonably been interpreted to mean that, if ultimately he needed an attorney, it would have to be an appointed one. This interpretation was buttressed by the fact that, immediately after Logsdon was read these rights, he was read and signed the waiver of rights which included the statement, "I do not want a lawyer at this time." This waiver took place before Jordan asked any questions about the collision.

{¶ 30} Having reviewed the record, including the body camera recording, we conclude that Logsdon was not in custody so as to require *Miranda* advisements. Further, nothing in Jordan's testimony or the video of the interview suggested that Logsdon lacked an understanding of his *Miranda* rights or the capacity to waive them.

The record does not suggest that his *Miranda* waiver was anything other than a free and deliberate choice made without intimidation, coercion, or deception. Finally, we conclude that Logsdon did not invoke his right to any attorney.

{¶ 31} Accordingly, the State's assignment of error is sustained.

### III. Conclusion

{¶ 32} The State's sole assignment of error being sustained, the order of the trial court suppressing Logsdon's statements is reversed, and this matter is remanded for further proceedings.

. . . . . . . . . . . . .


LEWIS, J. and HUFFMAN, J., concur.