[Cite as *State v. Holland*, 2023-Ohio-4834.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

STATE OF OHIO                          :

    Appellee                     :    C.A. No. 29791

                       :

v.                                     :    Trial Court Case No. 2022 CR 563

                       :

ALLANTE HOLLAND                        :    (Criminal Appeal from Common Pleas
                       :    Court)

    Appellant                    :

                       :

. . . . . . . . . . .

O P I N I O N

Rendered on December 29, 2023

. . . . . . . . . . .

CHRISTOPHER BAZELEY, Attorney for Appellant

MATHIAS H. HECK, JR., by MICHAEL P. ALLEN, Attorney for Appellee

. . . . . . . . . . . .

HUFFMAN, J.

{¶ 1} Allante Holland was convicted of murder and several firearms offenses in the Montgomery County Court of Common Pleas. He appeals, arguing that his convictions were against the manifest weight of the evidence, that the trial court erred in the admission or exclusion of certain evidence and in instructing the jury, that the prosecutor engaged

in misconduct, and that his sentence was contrary to law. For the following reasons, the trial court's judgment of conviction will be reversed with respect to his sentence for discharge of a firearm on or near prohibited premises, which was not in accordance with the Reagan Tokes Law; the matter will be reversed and remanded for resentencing with respect to that offense only. In all other respects, the judgment of the trial court will be affirmed.

## Procedural History and Facts

{¶ 2} Holland was indicted on April 27, 2022, on numerous counts related to the shooting death of Trevone Turner.[1] He was tried in April 2023. Holland was found guilty by a jury of three counts of murder, one count of improperly discharging a firearm at or into a habitation, two counts of felonious assault, one count of discharge of a firearm on or near prohibited premises, and all of the related firearm specifications. Holland was also found guilty by the trial court of having weapons while under disability. At sentencing, the court merged all the counts of murder and felonious assault and their attendant firearm specifications. Holland was sentenced as follows: for murder, 15 years to life in prison; for improperly discharging a firearm at or into a habitation, an indefinite sentence of 11 to 16½ years; for discharge of a firearm at or near a prohibited premises, eight years; for having weapons while under disability, 36 months, plus three 3-year terms for firearm specifications. Many of the sentences and specifications were ordered to be served consecutively, for an aggregate sentence of a minimum of 40 years to life to a maximum of 45½ years to life.

---

[1] Turner's first name is spelled various ways in the record.

{¶ 3} The evidence presented at trial established that, as a result of a dispute of unknown origin, Turner and five or six other individuals exited an SUV in the area of 228 Fer Don Road in the early morning hours of July 17, 2020, and began shooting at the residence. During the melee, which was caught in some respects on a home surveillance system located in the vicinity of the events, Turner was shot in the back of the head. The individuals with whom he arrived fled the scene, leaving Turner in the middle of the street. First responders transported him to the hospital, but Turner died several days later.

{¶ 4} A number of witnesses testified regarding circumstances supporting Holland's presence with Turner and the others who exited the SUV on Fer Don Road, although none of the witnesses identified the individual who shot Turner However, the State's theory of the case was based on complicity. Teresa Meyer, who lived on Fer Don Road with her boyfriend, testified that on July 17, 2020, at about 2:00 a.m., they were awakened by the sound of gunfire and "spraying bullets" from several guns. Meyer stated that the front door of their home was "shattered" by bullets, nearby cars were "riddled with bullets," and one bullet penetrated the door frame into her home. Meyer called 911 and, from her side door, she observed bullets in her driveway and in the street. She also observed a young male wearing black gloves and a hoodie, who was later identified as Turner, lying on his stomach in the street. Meyer saw blood behind Turner's head and noted that he was gurgling. Meyer also observed a dark SUV pass her home at a high rate of speed, without lights and without stopping at the nearby stop sign at the intersection of Fer Don Road and Wilbur Avenue. She testified that 228 Fer Don Road was a brick house across and up the street from her home, and a group of young adults

had been living there for the past year. According to Meyer, "there was tons of traffic going and coming from that house," and she observed "transactions going on there." Meyer stated that it "[a]bsolutely" appeared that the occupants of 228 Fer Don Road were dealing drugs.

{¶ 5} Channa Benton testified that she and Turner had lived together in Miamisburg; he was the father of her one-year-old son, and she was pregnant with another child of his when he was shot. According to Benton, Turner left their home every day, but "he always came back every night," and he drove a rented SUV. On July 16, 2020, Turner left home around noon, returned at 10:30 p.m., and left again at 10:45 p.m., having changed clothes into black sweatpants, a black hoodie, and black shoes. Benton expected Turner to return home again no later than 1:00 or 2:00 a.m. At 2:00 a.m., Turner's mother called Benton, and Benton learned that Turner had been hurt; Benton then drove from Miamisburg to Dayton to the home of Turner's mother. Benton typically maintained contact with Turner via his cell phone, and when she tried to call him after learning that he may have been hurt, at around 2:15-2:30 a.m., her call went directly to voicemail. After a couple of attempts to reach Turner, someone answered his phone, stating, "This Allante"; Benton hung up, having never heard of "Allante." On cross-examination, Benton testified that Turner had not been employed and had "hung out with a lot of people." Benton did know that Turner owned a weapon.

{¶ 6} Ryan Dalton, a Montgomery County Sheriff's deputy on road patrol, responded to 228 Fer Don Road on July 17, 2020, on the report of "shots heard." Dalton was the first officer to arrive at the scene, and he observed Turner lying in the roadway.

Dalton described Turner's visible head trauma and gasps for breath as "likely fatal." Dalton did not observe any weapons near Turner.

{¶ 7} Dr. Susan Brown, a forensic pathologist at the Montgomery County Coroner's Office, testified that Dr. Russell Uptegrove completed Turner's autopsy, and she performed the quality review of his work. Brown testified regarding Turner's cause of death and referred to eight autopsy photos of Turner's injuries, over objection. Turner's cause of death was determined to be a gunshot wound to the head, and the manner of death was determined to be homicide. A bullet entered the back of Turner's head and exited from his forehead. Brown could not determine the distance the bullet had travelled before striking Turner.

{¶ 8} William Hicks testified that he lived at 228 Fer Don in July 2020 with his father, William Hicks Sr., his brother, Delaquan Hicks ("Delaquan"), and Delaquan's three young children. On the night of the shooting, Hicks Sr. was out of town, Delaquan was at home, and Tevin Brown, Robert Prater, and Sherrod Hicks ("Sherrod") came over, along with Cheyenne Smith and Jenae Williams. They were all "just chilling," according to Hicks. While playing a game, Delaquan and Prater began to argue, and Hicks headed to his car to "get some weed so we can roll up and just chill." Hicks's car, a Ford Edge, was across the street from his home, but he did not reach the vehicle; as Hicks began walking to his vehicle, he observed five people who were dressed in black, with face coverings and firearms in their hands, jump out of a vehicle that was on the same side of the street as his and begin shooting. Believing his residence was being targeted, Hicks ran back to the house and took cover. Delaquan "came out and started shooting back"

with their father's "Glock" to protect Hicks. Hicks heard glass breaking in his home from bullets.

{¶ 9} After the gunfire ended, "we went back out there and seen who it was" lying in the street. Hicks approached the individual lying in the street with Delaquan and Sherrod. Hicks recognized the individual as someone he knew as "Tre-Way" "through altercations with [his] brother." Hicks removed a mask from Turner's face and observed him struggling to breathe. Hicks identified photos of his home depicting a bullet hole in the living room window and a bullet mark on a closet door in a first-floor bedroom from the shooting. Hicks did not specifically see who had shot Turner, but he "seen five of them get out and start shooting."

{¶ 10} On cross-examination, Hicks stated that there was "most definitely" a lot of ongoing activity at 228 Fer Don Road prior to the shooting, with people coming and going. He denied that drugs had been sold but testified that his cousin "was selling dinners" at the house. When asked if there had been a lot of money in the home, Hicks indicated that any money was from his father's social security payments. Hicks also testified that members of the "Two Hunnid" gang, "a music family thing," came and went from the home often, and "you can say that people have a lot of beef with them." Delaquan and Tevin Brown were members of "Two Hunnid." When asked if there had been "bad blood" between Delaquan and Turner, Hicks responded, "I guess something came stolen from they house, and they thought that my peoples took it, so * * * retaliation or whatever." Hicks was unable to identify any of the shooters who fled the scene.

{¶ 11} Erika Turner ("Erika"), age 29, testified that Turner was her younger brother

and his nicknames were "Tre" and "Tre-Way." Erika described Turner as her best friend, and she saw him every day. Erika lived at Meadows of Catalpa with Louis Holland ("Louis"), who was Allante Holland's brother, and her children. On July 16, 2020, Turner came to Erika's apartment, using his key to get in while she was sleeping, and awakened her; Louis was not home, and Turner stayed for about 15 minutes, leaving around 10:00 p.m. Out of the window of her apartment, Erika observed Turner get into the driver's side of a Jeep, where there were four other occupants; Erika observed Antonio Hughley in the passenger seat of the Jeep, and she believed that Terrence Bass and Andre Ferguson were also in the Jeep. According to Erika, Turner carried a cell phone.

{¶ 12} When Turner drove away, Louis and Holland were not at her home. Erika went back to bed and was later awakened by Holland around 1:00 or 2:00 a.m.; he was asking her car keys, and Erika described him as "hysterical, panicking." Erika asked who was in her room, and Holland identified himself; Holland was well-known to Erika, as he was the brother of Louis, the father of her children. Erika did not give him her keys, and he left. According to Erika, "[b]ecause [of] the way he was acting, I knew something was going on. I thought it was my kids' dad [Louis], so I called my mom crying, saying something happened."

{¶ 13} Sometime in the early morning hours of July 17, 2020, Louis and Holland arrived at the apartment together. Erika testified that their demeanor was quiet, and she asked them about Turner's whereabouts. Holland told her that he had "emptied two clips" and began crying. Holland handed Turner's phone to Erika. Based on the information she had, Erika was concerned for Turner's wellbeing, and she and Louis left

the apartment while Holland remained there with the children. According to Erika, Louis told her what had happened to Turner, and they proceeded to Fer Don Road. Police were present, and she told them Turner was her brother. She did not tell them about her interaction with Holland. On cross-examination, Erika acknowledged that Detective Shiverdecker attempted to get in contact with her after the shooting, and she initially refused to cooperate or give a statement, but she did so nine months after the shooting.

{¶ 14} DeAngelo Turner ("DeAngelo") (also known as Chad Turner) testified that his siblings included Erika and Turner. DeAngelo stated that he and Turner had been very close and that he last saw him two days before he died. At that time, DeAngelo had been in an earlier physical altercation, his mother had given him a firearm for protection, and Turner had picked up the weapon to return it to their mother. With respect to the events around Turner's death, DeAngelo testified that he had received a notification on his phone from WHIO News that there had been a drive by shooting on Fer Don Road, and he then received a phone call from his mother between July 16 and July 17, 2020, and proceeded to her home. Erika and Louis were also there. Within a few minutes, DeAngelo left his mother's home with Latoya Booker, his godsister, and proceeded to Grandview Hospital. After describing Turner's tattoos to hospital personnel, DeAngelo learned that Turner had been shot.

{¶ 15} DeAngelo testified that, on his way to his mother's home, he had attempted to call Turner on Turner's cell phone. When the call was answered, DeAngelo asked, "Who the f*** is this," and the person on the other end of the line answered, "This is Allante." DeAngelo had never met Holland. DeAngelo asked Holland why he had

Turner's phone, and Holland said he had given the phone to Erika. Erika was present at the time with Holland. DeAngelo called Turner's phone again on the way to Grandview Hospital with Booker, and Holland again answered it. When Booker began to question Holland on the phone, DeAngelo stated Holland gave "[v]ery, very empty answers" and said Turner's phone had been "dropped." DeAngelo viewed State's Exhibit 215(A), surveillance video of the shooting; he "saw several dark figures get out of the car and start shooting the other side," but he was unable to identify anyone on the video.

{¶ 16} Sergeant Jared Donohoo of the Montgomery County Sheriff's Office forensic services unit responded to 228 Fer Don Road on July 17, 2020. He testified that there had been "multiple casings and bullet fragments throughout that entire area," including 209 Fer Don, as well as a car seat and a backpack close to an intersection at Wilbur Avenue, south of 209 Fer Don Road. The car seat and backpack appeared to have "been thrown from a vehicle at some point," and an LG phone was found in the backpack. According to Donohoo, it was "a pretty big scene" that also included a pool of blood from Turner's injury. Donohoo also testified that firearms that contain a clip eject bullet casings when the trigger is pulled.

{¶ 17} Matthew Poulton, an evidence technician with the Montgomery County Sheriff's Office at the time of the shooting, testified that he responded to 228 Fer Don Road "to process the search warrant" on the residence. He testified that there were two bullet strikes and a bullet hole through a window on the south side of the house." An interior closet was also struck by a bullet. He identified photos her had taken, including a nine-millimeter rifle, an "AR magazine," and some ammunition, which were found

upstairs. Downstairs, ammunition was also found wrapped in brown paper in a heating pad cover, as well as a "butt stock" to a rifle and a "drum magazine for a firearm" that could hold 30 to 50 rounds. Poulton recovered a bullet lodged in the closet door and a bullet from a vehicle parked on Fer Don Road.

{¶ 18} Brian Shiverdecker, a deputy in the Montgomery County Sheriff's Office, spoke to Hicks and Delaquan after the shooting. Delaquan admitted shooting his father's gun, a Glock 48 nine-millimeter, which he provided to Shiverdecker. The weapon contained a ten-round single stack clip. In the course of his investigation, Shiverdecker initially attempted to reach Erika several times unsuccessfully, but she spoke to him months later in April 2021.

{¶ 19} On cross-examination, Shiverdecker testified that the shooting involved "a conflict between two groups," that "T[w]o Hunnid" was an identified gang within the City of Dayton and Montgomery County, and that Delaquan was "an identified member of "T[w]o Hunnid" who lived at 228 Fer Don Road. Shiverdecker interviewed Delaquan on July 24, 2020; he was unable to determine what the conflict had been about that led to the shooting. He was also unable to identify the individuals on the video from the surveillance system on a home near 228 Fer Don or who fired the shot that killed Turner

{¶ 20} Isaiah Kellar, a detective with the Montgomery County Sheriff's Office, described the process of extracting information and data from a cell phone, including images, videos, web history, call logs, text messages, and application data. Kellar identified the cell phone provided to him from the scene, from which he downloaded information. He stated that the username for the phone was determined to be

hollandallante@gmail.com, and the email address was "the actual Google package that's within" the cell phone. On cross-examination, Kellar acknowledged that a cell phone and its registered owner can be in separate locations.

{¶ 21} Justin Mays and Cherish Isaacs both testified that they were evidence technicians in the Montgomery County Sheriff's Office. On July 21, 2020, Mays processed a black Jeep Grand Cherokee. Mays described the procedures he employed, including photographing and collecting items found inside the vehicle. Mays swabbed several of the items for DNA evidence. He also obtained three fingerprints from the passenger area of the vehicle. Mays did not find weapons or ammunition in the vehicle, but he did recover a holster. Isaacs also processed the Jeep Grand Cherokee for DNA evidence, obtaining 31 swabs.

{¶ 22} Robert Burns, a firearm examiner at the Miami Valley Regional Crime Laboratory (MVRCL), received 62 cartridge casings from the scene of the shooting, bullet fragments, and firearms for testing. He identified a Glock model 48 and a KelTec rifle, both of which he had test-fired and compared to casings and bullet fragments from the scene. Burns stated that the 62 casings recovered came from eight different firearms. Six cartridge cases and two bullets were identified as having been fired from the Glock, including the bullet which struck the doorframe at 209 Fer Don.

{¶ 23} Mary Barger, a forensic scientist in the serology and DNA section of the MVRCL for over 19 years, testified that she had received known DNA standards from Nicole Dukes, Nathan Miller, Andre Ferguson, Louis, Quasawn Taborn, and Holland, as well as DNA from Turner's blood, to compare to the items submitted for testing. The

result from testing the KelTec rifle was a mixed DNA profile, meaning it included DNA from more than one person such that she could not specifically determine whose DNA was present. Testing of the booster seat found at the scene also yielded a mixed DNA profile, and she made no determination regarding the presence of Holland's DNA. Turner's DNA was exclusively found on a cigarette butt collected from the Jeep to a reasonable degree of scientific certainty. Holland's DNA was found on 31 shell casings recovered from the scene.

{¶ 24} Jennifer Yoak, a latent print examiner at the MVRCL, processed multiple items from the scene of the shooting for fingerprints. From the booster seat, Yoak obtained Holland's left thumb print and Turner's left palm print and two of his fingerprints. Holland's thumb print was "a high quality print." On cross-examination, Yoak acknowledged that she was unable to determine the length of time that a print had been on an item. She retrieved no prints of value from the cell phone obtained from the scene or from the Jeep Cherokee. Yoak testified that it is possible for a person to touch an item and not leave a print behind that is suitable for comparison to known prints.

{¶ 25} Holland did not call any witnesses at trial.

{¶ 26} Holland appeals from his convictions, raising six assignments of error. We will consider the assignments in an order that facilitates our analysis.

{¶ 27} Holland's second assignment of error is as follows:

THE TRIAL COURT ABUSED ITS DISCRETION BY ALLOWING GRUESOME AND DUPLICATIVE AUTOPSY PHOTOGRAPHS TO BE ENTERED AS EVIDENCE.

**{¶ 28}** To be admissible, "the probative value of each photograph must outweigh the danger of prejudice to the defendant and, additionally, not be repetitive or cumulative in nature." *State v. Froman*, 162 Ohio St.3d 435, 2020-Ohio-4523, 165 N.E.3d 1198, ¶ 103, quoting *State v. Morales,* 32 Ohio St.3d 252,259, 513 N.E.2d 267 (1987). The admission of gruesome photographs is left to the sound discretion of the trial court. *State v. Vrabel,* 99 Ohio St.3d 184, 2003-Ohio-3193, 790 N.E.3d 303, ¶ 69. "A court abuses its discretion by acting in a manner that is unreasonable, arbitrary or unconscionable." *State v. Jackson*, 2015-Ohio-5490, 63 N.E.3d 410, ¶ 22 (2d Dist.), quoting *State ex rel. Askew v. Goldhart*, 75 Ohio St.3d 608, 610, 665 N.E.2d 200 (1996). "Decisions are unreasonable if they are not supported by a sound reasoning process." *Id.*, quoting *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990).

**{¶ 29}** Dr. Susan Brown, the pathologist who testified at trial about Turner's autopsy, indicated that certain photographs offered by the State would assist in explaining her testimony related to the death and the autopsy findings. Holland's counsel objected to the publication to the jury and the admission of State's Exhibits 1, 3, 7 and 8, which were photographs taken during Turner's autopsy. Holland did not object to the admission of Exhibits 2, 4, and 5, which were also photographs taken during the autopsy, or to State's Exhibit 6, a photograph of a bullet fragment removed from Turner during the post-mortem examination.

**{¶ 30}** State's Exhibit 1 was a photograph of the condition of Turner's body upon receipt by the Coroner's Office. The State argued that the exhibit would permit Brown to

explain why the medical intervention Turner received would impact her ability to determine if his wound had been a contact wound or the range from which the shot had been fired. The court noted that there had been testimony that Turner survived the shooting for a couple of days and that the medical intervention he received while hospitalized could have affected the evidence that was received or collected by the coroner. The court admitted State's Exhibit 1, but it cautioned the State to limit the amount of time the exhibit was displayed to the jury.

{¶ 31} State's Exhibit 3, a photograph of Turner's face, showed the exit wound of the bullet on his forehead. The State sought to use the exhibit to demonstrate that the bullet that killed Turner entered the back of his head and exited his forehead, thus demonstrating that he was shot by one of the persons with whom he arrived at 228 Fer Don Road; in other words, the fatal shot was not from the individual who returned fire from the residence at the persons in the street (including Turner). The State noted that, in his opening statement, Holland's counsel had suggested that Turner was shot by someone in or at the residence at 228 Fer Don, and Exhibit 3 demonstrated that the exit wound was in Turner's forehead area. Exhibit 7, a second view of the exit wound on Turner's forehead, provided a different perspective and included a measurement of the size of the exit wound, permitting Dr. Brown to further explain her conclusion that the injury to Turner's forehead demonstrated the trajectory of the bullet and an exit wound. Over defense counsel's objection, the court admitted State's Exhibits 3 and 7 but again cautioned that the exhibits should be displayed to the jury for a limited period of time.

{¶ 32} State's Exhibit 8 was a photograph of Turner's skull and scalp. It assisted

Brown in testifying that the bullet's entrance was to the back of Turner's skull, in further support of the State's theory that Turner was shot by one of the individuals with whom he arrived at 228 Fer Don, rather than by an individual returning fire from that residence.

{¶ 33} In our view, the trial court reasonably concluded that the probative value of each of the four photographs of Turner's autopsy to which Holland objected outweighed the danger of any unfair prejudice to him. The photos supported Brown's testimony concerning the nature and circumstances of Turner's death and the trajectory of the bullet into and through his skull. Only seven photographs that could be described as gruesome were admitted, and each was admitted for the purpose of explaining Brown's testimony. The photographs were not repetitive or cumulative in nature. We cannot conclude that the court abused its discretion in admitting State's Exhibits 1, 3, 7 and 8. Holland's second assignment of error is overruled.

{¶ 34} Holland's third assignment of error is as follows:

THE TRIAL COURT ABUSED ITS DISCRETION BY PROHIBITING HOLLAND FROM SHOWING THE JURY A PRE-DEATH PHOTOGRAPH OF TURNER.

{¶ 35} Holland argues that the trial court abused its discretion by prohibiting him from using a pre-death photograph of Turner when cross-examining Det. Shiverdecker and from displaying the photograph to the jury. Holland claims that the photograph was evidence of Turner's character and was thus relevant and probative. The photograph, which was marked as Defendant's Exhibit A, appeared to be from a social media page, identified the person as "Tre Way," and was dated July 9, approximately 11 days before

Turner's death. The photograph depicted an individual with a large, splayed stack of $100 bills and was captioned: "f--- all of da oppz an we gone kill em all!!". It also displayed a number of emojis.

**{¶ 36}** In a sidebar discussion prior to defense counsel's cross-examination of Shiverdecker, defense counsel advised the court that he intended to utilize the photograph to identify Turner, to show "what was going on at the time," and to explain why Turner went to the residence at 228 Fer Don Road. The court inquired as to the authentication of the photograph and expressed concern about the statement accompanying the picture. Defense counsel argued that the statement was not offered for the truth of the matter asserted. The court indicated that, unless the statement were redacted from the photograph, she would not permit it to be shown to the jury or admitted into evidence. Defense counsel refused to redact the statement from the photograph to gain its admission.

**{¶ 37}** When engaging in its gatekeeper role regarding the admissibility of evidence, the trial court must determine if potential evidence is relevant. To be relevant, evidence must have a "tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." Evid. R. 401. In other words, there must be some probative value to the evidence. Generally, relevant evidence is admissible. Evid. R. 402. However, even if evidence is relevant, it can become inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or of misleading the jury. Evid. R. 403(A).

{¶ 38} Evid.R. 404(A) states: "Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion." In other words, it does not necessarily follow that because a person performed an act in the past, he or she committed the act at issue in the trial. *See State v. Robinson*, 2d Dist. Montgomery No. 29272, 2022-Ohio-2896, ¶ 18-19.

{¶ 39} One exception to Evid.R. 404(A) is that "[e]vidence of a pertinent character trait of the victim of the crime offered by an accused * * * is admissible." Evid.R. 404(A)(2). However, Evid.R. 405 provides that "[i]n all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion."

{¶ 40} Although defense counsel also asserted as a basis for its admission that the photograph of Turner established his identity, Turner's identity was not at issue. Turner's character also was not at issue. As such, Exhibit A was not relevant. Although defense counsel framed his argument as one related to Turner's identity, he suggested that the real purpose of seeking to admit the photograph was to establish why Turner went to Fer Don Road on the evening of July 17, 2020. However, the record was replete with evidence about why Turner and others traveled to Fer Don Road, exited their vehicle, and shot at a home prior to defense counsel's cross-examination of Det. Shiverdecker. Although the parties discussed at sidebar whether the caption of the photograph was hearsay offered to establish that Turner had acted to settle a "beef" and shoot up 228 Fer Don Road, we need not consider whether the statement was hearsay; Turner's character was not in issue, and thus the trial court did not abuse its discretion in refusing to admit

the exhibit.

{¶ 41} Holland's third assignment of error is overruled.

{¶ 42} Holland's fourth assignment of error states:

THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT OVERRULED HOLLAND'S MOTION FOR A MISTRIAL, OBJECTION, AND REQUEST FOR A CORRECTIVE INSTRUCTION AFTER THE STATE MADE A REFERENCE TO THE OTHER UNCHARGED GANG MEMBERS INVOLVED IN THE SHOOTING.

{¶ 43} Holland argues that the State made improper and prejudicial remarks during its closing argument. He argues that, if it was improper for the jury to be explicitly told that Holland was the only one charged, it was also "improper to allow the state to suggest the same in its closing argument." Holland argues that he was prejudiced because, if the jury believed that he was the only person charged, it might have inferred that he must be guilty because the State "would only charge the individual who actually shot the bullet" that killed Turner. Holland further asserts that the evidence linking him to the shooting was "circumstantial and weak."

{¶ 44} "The granting or denial of a motion for mistrial rests in the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion." *State v. Treesh*, 90 Ohio St.3d 460, 480, 739 N.E.2d 749 (2001), citing Crim.R. 33; *State v. Sage*, 31 Ohio St.3d 173, 182, 510 N.E.2d 343 (1987). "This standard is based upon the notion that the trial court is in the best position to determine whether the circumstances of the case necessitate the declaration of a mistrial or whether other corrective measures

are adequate." *State v. Oteng*, 10th Dist. Franklin No. 14AP-466, 2015-Ohio-1231, ¶ 26. This Court may not substitute its judgment for that of the trial court absent an abuse of discretion. *Id.*

{¶ 45} A mistrial should not be ordered in a criminal case merely because some error or irregularity has occurred. *State v. Reynolds*, 49 Ohio App.3d 27, 33, 550 N.E.2d 490 (2d Dist.1988). "The granting of a mistrial is necessary only when a fair trial is no longer possible." *Treesh* at 480, citing *State v. Franklin*, 62 Ohio St.3d 118, 127, 580 N.E.2d 1 (1991). "To determine whether the defendant was deprived of a fair trial, we must determine whether, absent the improper remarks, the jury would have found the appellant guilty beyond a reasonable doubt." *State v. Maurer*, 15 Ohio St.3d 239, 267, 473 N.E.2d 768 (1984).

{¶ 46} Regarding a corrective jury instruction, "[a] trial court has broad discretion to decide how to fashion jury instructions, but it must 'fully and completely give the jury all instructions which are relevant and necessary for the jury to weigh the evidence and discharge its duty as the fact finder.' " *State v. White*, 142 Ohio St.3d 277, 2015-Ohio-492, 29 N.E.3d 939, ¶ 46, quoting *State v. Comen*, 50 Ohio St.3d 206, 553 N.E.2d 640 (1990), paragraph two of the syllabus. "A defendant is only entitled to have his proposed jury instructions given when they are correct statements of the law, pertinent to the evidence in the record or to material issues, and are timely presented and not already included in the substance of the jury charge." *State v. Elliott*, 2d Dist. Montgomery No. 26104, 2014-Ohio-4958, ¶ 23, citing *State v. Guster*, 66 Ohio St.2d 266, 269, 421 N.E.2d 157 (1981). When reviewing the trial court's jury instructions, the proper standard of

review is whether the trial court's decision to give or exclude a particular jury instruction was an abuse of discretion under the facts presented. *State v. Blanton*, 2023-Ohio-89, 206 N.E.3d 14, ¶ 25 (2d Dist.).

**{¶ 47}** Holland moved for a mistrial and requested a curative instruction to the jury based upon alleged prosecutorial misconduct in closing argument. However:

> Prosecutors are afforded wide latitude in the presentation of closing arguments. *State v. Arrone*, 2d Dist. Greene No. 2005-CA-89, 2006-Ohio-4144, ¶ 126; *State v. Lott*, 51 Ohio St.3d 160, 165, 555 N.E.2d 293 (1990). They may comment freely on " 'what the evidence has shown and what reasonable inferences may be drawn therefrom.' " *Lott* at 165 * * *, quoting *State v. Stephens*, 24 Ohio St.2d 76, 82, 263 N.E.2d 773 (1970). * * * "Both parties * * * may be 'colorful or creative' [during closing arguments] but not purely abusive, inflammatory, or purely derogatory." *State v. Whitaker*, Ohio, 2022-Ohio-2840, 207 N.E.3d 677, ¶ 96, quoting *State v. Brown*, 38 Ohio St.3d 305, 317, 528 N.E.2d 523 (1988).
>
> * * *
>
> "The test for prosecutorial misconduct is whether remarks were improper and, if so, whether they prejudicially affected substantial rights of the accused." *State v. Jon*es, 90 Ohio St.3d 403, 420, 739 N.E.2d 300 (2000), citing *State v. Smith*, 14 Ohio St.3d 13, 14, 470 N.E.2d 883 (1984). "The touchstone of the analysis 'is the fairness of the trial, not the culpability of the prosecutor.' " *State v. Garrett*, Ohio, 2022-Ohio-4218, __ N.E.3d __,

¶ 144, quoting *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982). "Where it is clear beyond a reasonable doubt that a jury would have found the defendant guilty even absent the alleged misconduct, the defendant has not been prejudiced, and his conviction will not be reversed." *State v. Stevenson*, 2d Dist. Greene No. 2007-CA-51, 2008-Ohio-2900, ¶ 42, citing *State v. Loza*, 71 Ohio St.3d 61, 78, 641 N.E.2d 1082 (1994).

* * * "For a prosecutor's closing argument to be prejudicial, the remarks must be 'so inflammatory as to render the jury's decision a product solely of passion and prejudice.' " *Arrone* at ¶ 126, quoting *State v. Williams*, 23 Ohio St.3d 16, 20, 490 N.E.2d 906 (1986). " 'Even if the prosecutor's statements during closing arguments are improper, reversal based upon those statements is warranted only if the statements permeate the entire atmosphere of the trial.' " *Id.*, quoting *State v. Tumbleson*, 105 Ohio App.3d 693, 699, 664 N.E.2d 1318 (12th Dist.1995).

*State v. Ward*, 2023-Ohio-328, 208 N.E.3d 143, ¶ 61, 66-67 (2d Dist.).

{¶ 48} The state's theory of Holland's culpability was one grounded in complicity; at no time did the State argue or suggest that Holland was the principal offender. R.C. 2923.03 governs complicity and states: "It is no defense to a charge under this section that no person with whom the accused was in complicity has been convicted as a principal offender." R.C. 2923.03(B). "Whoever violates this section is guilty of complicity in the commission of an offense, and shall be prosecuted and punished as if he were a principal

offender. A charge of complicity may be stated in terms of this section, or in terms of the principal offense." R.C. 2923.03(F).

**{¶ 49}** The following portion of the State's closing argument, and the exchange between the court and counsel that followed, is at the center of this assignment of error:

[THE PROSECUTOR]: And no, the State of Ohio can't prove to you which of those guns went into his head. Why can't we prove that? Because they got rid of their guns. And the law says there's - - whether counsel likes it or not, the law says we don't have to tell you which one of those guns went into the back of his head. That's not a - - that's not a get out of this free kind of card, because you took so many people shooting that we can't tell which one when you get rid of the guns. That's not how this works. We aren't required to show which one of them went into his head, because then the bad guys know they just got to get rid of their guns, and how would we ever be able to answer that question?

It's an - - it is an answerable question. It certainly is an answerable question, but the guys with the guns know that, that's why they get rid of them. And so, no, the law does not, like it or not, the law does not require us to say whose bullet went into the back of his head. That's what the law is. If you're acting together with common intent and purpose, and watch that video, because nothing could be clearer, and you don't know how many guns are shooting, spend a minute with that video, and you will see each one of those people who comes out of that has a flash next to him. And

you know how many guns there are. There's seven. And whether six people or seven people come out of that van, whether one person has two guns, I don't know. I can count six. Can you count seven? It doesn't matter, because I can tell you who was there. And that's what matters in this trial.

You may be wondering, and you can speculate, I don't know all these other guys. Why is he the only one charged? He's the only one charged for this jury to worry about. That's always true in complicity cases, which is you want to know what's going on with the other people. That's not - - that's the question for a different jury a different day. Because under the law, every single person who is out there firing guns over a roadway, into a habitation, risking lives, every one of those people can, should be charged the same way he is if the evidence supports it. But that's - - those are different questions for different juries on different days.

[DEFENSE COUNSEL]: Objection.

THE COURT: Come up.

(At sidebar)

THE COURT: What's your basis?

[DEFENSE COUNSEL]: I'm going to object, Your Honor, because I think she's getting into - - she's making statements, knowing that nobody else has been charged.

THE COURT: Yet - -

[DEFENSE COUNSEL]: And then she's saying there are - - that's different juries for [a] different day. That's implying that other people have been charged, and that there are separate juries here who are going to determine anybody else's fate. And I didn't get up there and say, look, he's the only one that's been charged out of all these people. I stayed away from that. But I think the State is improper in inferring that other people have been charged, and they're just waiting on their day in court in front of a jury. That's improper.

* * *

[THE PROSECUTOR]: Well, Defense went to great lengths to suggest that we were just picking at this person, because we'll cha[r]ge just anybody. And we would charge anybody if we have the evidence on who was out there, and that's the facts. And we aren't done. If evidence develops against anybody else, they will be charged in this case. It happens at this point, all of the evidence points to one guy. But we keep looking.

THE COURT: * * * So [the prosecutor] did not misstate the state of the law. It would be charged separately, and their duties are simply around this particular Defendant and these particular charges. I'm going to overrule the objection * * *. I don't think you went that far so far, because I was listening pretty intently to what you were saying. * * *

[DEFENSE COUNSEL]: I would move for a mistrial on that basis.

And I would ask the Court to give the jury a cautionary instruction that Mr. Holland is the only one who has been charged thus far out of this case.

THE COURT: I absolutely am not going to inform the jury that Mr. Holland is the only one charged. That's irrelevant for the jury to consider under circumstances. [Ms. Prosecutor], would you like to respond to the motion for a mistrial?

[THE PROSECUTOR]: We have not - - we have not missed [sic] it at all. * * * All that's been said has been factual. It is a direct response to the things that we were seeing. * * *

THE COURT: I would agree. The Court is going to overrule your motion for a mistrial. I don't think that there has been any type of misconduct here, and blatant misstatement of the law by [the prosecutor]. I believe indicating to the jury that, particularly when there is a [complicity] issue in effect in the case, that they are only able to be considering the one person in front of them and no one else is proper. * * * I don't believe [the prosecutor] went further than that. So I don't believe there's any grounds for a mistrial. So I'm going to overrule that.

[DEFENSE COUNSEL]: I would ask the Court to give [the prosecutor] a curative instruction that she not be allowed to comment further on other Defendants with * * * other juries.

THE COURT: * * * [The prosecutor's] made the point that she intended to make and it's time to move on from this issue anyway, so.

{¶ 50} We see no prosecutorial misconduct. We also conclude that an abuse of discretion is not demonstrated in the court's denial of Holland's motion for a mistrial and his request for a jury instruction that Holland was the only person charged in the shooting death of Turner   The jury viewed dramatic video of multiple individuals jumping from a vehicle and firing multiple shots at the scene; unlike Holland, the other individuals were not identified through the evidence.   The prosecutor merely indicated that in complicity cases, it is natural for jurors to wonder about the culpability of others involved in the offenses, but that the jury's charge was limited to the evidence adduced against Holland. Further, the prosecutor's comment was isolated in nature, and it was a correct statement of law that "every single person who is out there firing guns * * * can, should be charged.". Significantly, after the prosecutor's closing argument, the court correctly instructed the jury on the law of complicity.

{¶ 51} Because we conclude that, in the absence the prosecutor's remark, the jury would have found Holland guilty beyond a reasonable doubt (as discussed more fully in our analysis of his first assignment of error), and because the fact that no others were charged in the shooting was not pertinent to the evidence in the record or to material issues presented, Holland's fourth assignment of error is overruled.

{¶ 52} We next consider Holland's first assignment of error:

HOLLAND'S CONVICTIONS ARE AGAINST THE WEIGHT OF THE EVIDENCE.

{¶ 53} Holland directs our attention to "four pieces of evidence" relevant to whether he was present at the scene of the crime: the testimony of Erica Turner, Barger's

testimony about DNA evidence, and the facts that Holland's cell phone was found in a bag at the scene and his fingerprints were found on a child's booster seat also found at the scene. He argues that this evidence did not show "conclusively" that he was at the scene, and therefore his conviction was against the weight of the evidence. The State responds that Holland views each of these pieces of evidence separately, but that when the evidence and the jury's observations of the witnesses are viewed collectively, the evidence supported Holland's convictions. The State further notes that each of its witnesses was subject to cross-examination on the issues raised herein. We will discuss each of Holland's arguments individually after setting forth our standard of review.

{¶ 54} "[A] weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." (Citations omitted.) *State v. Jones*, 2d Dist. Montgomery No. 25724, 2014-Ohio-2309, ¶ 8. "When evaluating whether a [judgment] is against the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *Id.*, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997).

{¶ 55} Because the trier of fact sees and hears the witnesses at trial, an appellate court must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses. *State v. Lawson*, 2d Dist. Montgomery No. 16288,

1997 WL 476684, *4 (Aug. 22, 1997). However, we extend less deference in weighing competing inferences suggested by the evidence. *Id.* The fact that the evidence is subject to differing interpretations does not render the judgment against the manifest weight of the evidence. *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 14. A judgment should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 56} R.C. 2903.02 proscribes murder and states: "No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree * * *." R.C. 2923.161(A)(1) governs improperly discharging a firearm at or into a habitation and states: "No person, without privilege to do so, shall knowingly * * * [d]ischarge a firearm at or into an occupied structure that is a permanent or temporary habitation of any individual." R.C. 2903.11 proscribes felonious assault as follows: "(A) No person shall knowingly do either of the following: (1) Cause serious physical harm to another * * *; (2) Cause or attempt to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance." R.C. 2923.162 governs the discharge of a firearm on or near prohibited premises and states: "(A) No person shall * * * (3) Discharge a firearm upon or over a public road or highway." Finally, R.C. 2923.13(A)(3) proscribes having weapons while under disability: "no person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance" if the person "has been convicted of any felony offense involving the illegal use, sale, administration, distribution, or trafficking in any drug of abuse."

1.

{¶ 57} Holland argues that Erika's testimony that she heard him state that he "emptied both clips" in the course of the incident "must be considered in the light of her surrounding testimony and her motivation for testifying." Holland notes that Erika testified that he was speaking quietly when he arrived at her apartment, and he asserts that she concluded that he was only "maybe" referring to a shooting, so she "brushed it off." According to Holland, other portions of Erika's testimony demonstrated that he was not involved in the shooting, because he was not among the other participants who left her home in the black Jeep. He also notes that Erika waited nine months to contact law enforcement and did so only after her relationship with Louis ended. Holland suggests that Erika's testimony that Det. Shiverdecker lied in his report when he stated that she had told him that Holland spent the evening at her apartment but told the truth about her statement about his emptying two clips somehow discredited all of her testimony.

{¶ 58} Erika testified that when Holland and Louis came to her apartment together, she met them at the door and "they g[o]t quiet." Then the following exchange occurred:

[PROSECUTOR] Q. What does [Holland] say?

[ERIKA] A. [Holland] then proceeds to say he emptied two clips.

Q. When [sic] you understand that to mean?

A. He was shooting, maybe.

* * *

Q. Yeah, what is a clip? Like a hair clip?

A. No, like a clip for a gun.

\* \* \*

Q.   And when he said that, what was his demeanor?   What was his emotion, his attitude?

A.   \* \* \* it's like he was shaken up, but normal.

\* \* \*

Q.   What do you want to know?

A.   I just looked, like, huh?   And I just, like brushed it off.

Q.   At that point, did you know anything about something had happened to your brother?

A.   No.

{¶ 59} Erika further testified that she had asked Louis about Turner's whereabouts and he "just put his head down."   She then asked Holland the same question, and he "grabbed me, and he was crying."   Erika testified that Holland gave her Turner's phone, and "he was really - - he was sad."

{¶ 60} The following exchange also occurred during Erika's trial testimony:

Q. With respect to [Holland's comment that he emptied two clips], did you think that was important information?

A.   Yes, but I didn't ask what it was about.

\* \* \*

Q.   With respect to information that you may have gotten from even Louis, did you think maybe the police might want to talk to you about that?

A.   Yes.

Q. Did you want to go to the police?

A. No.

* * *

Q. Did there come a time when you decided to tell the police?

A. Yeah.

Q. Had anything changed in your nature to the relationship with you and Louis at that time?

A. No.

Q. At some time after that, you had another child with Louis?

A. Yes.

Q. And then, did you guys stay together, or did you break up?

A. We went our separate ways.

Q. And was it before or after you went your separate ways that you talked to the police?

A. After. * * *

Q. Did you feel in the middle of things?

A. Yeah.

* * *

Q. Was there anything that was causing you, kind of, emotional conflict about talking to the police?

* * *

A. No.

* * *

Q.   No?   Was there anything about the nature of your relationship with Louis * * * that was stopping you from talking to the police?

* * *

A.   No.

* * *

Q.   What was your hesitation?

A.   The process.   I keep having to relive it over and over.

* * *

Q.   That's * * * as you're having to go through this and being asked questions about what happened, what does that doing [sic] to you?

A.   Taking me back to the day.

{¶ 61} On cross-examination, Erika denied telling Det. Shiverdecker that when she went to sleep, Holland was in her apartment and Turner was gone with others in the Jeep. On redirect examination, Erika stated, "I am telling the jury what I remember and what happened."   She testified that when Holland mentioned emptying two clips, he was "messed up" and "sad," and he remained that way until she left to look for Turner.

{¶ 62} The exchange to which Holland directs our attention on recross-examination is as follows:

Q.   [Erika], you came up with this story nine months after this occurred, correct?

A.   Story?

Q.   What you've testified to today?

A.   I told exactly what happened.

Q. * * * Nine months after it occurred, correct?

A.   Correct.

Q.   * * * And you told Det. Shiverdecker, because he wrote it.   He said, "Erika stated that when she went to sleep, her brother left, and [Holland] and [Louis] was still at the house."

A.   They wasn't there.   That's a lie.

Q.   So you're saying the detective lied on you?

A.   That's exactly what I'm saying.

{¶ 63} Initially, we note that Holland mischaracterizes Erika's testimony when he asserts that she found his statement that he had emptied two clips to be "so benign that she did not take it seriously."   Although Erika indicated that, when Holland made the statement, she thought he "was shooting maybe" but she "brushed it off," it is significant that, at that time, she had no reason to be specifically concerned about Turner's safety or any knowledge about why Holland had been shooting or at whom.   We cannot agree that Erika's testimony suggested that Holland's statement was gentle or kindly, as the word "benign" suggests.   Erika further described Holland's demeanor as shaken up, crying, and sad when he gave her Turner's phone.   Holland also overlooks Erika's testimony that he was "hysterical" and "panicking," when he woke her up and asked for her keys.   In other words, we cannot agree that Erika's testimony about Holland emptying two clips was somehow exculpatory when considered with her "surrounding testimony."

{¶ 64} We further cannot agree with Holland's characterization that Erika's testimony demonstrated that Holland was not involved in the shooting simply because she testified that he was not among those who left her home in the Jeep hours before the shooting and that she did not see him with a firearm. For the reasons discussed throughout our opinion, the evidence supported the jury's conclusion that Holland was at the scene and complicit in the shooting of Turner.

{¶ 65} Finally, the jury was not compelled to conclude that Erika's motivation for testifying was "questionable" and had been prompted by the end of her romantic relationship with Louis, as suggested by Holland. Erika testified that she did not immediately go to police upon learning of the shooting because she did not want to relive the circumstances of Turner's death, having considered him her best friend. The jury, which observed Erika on the stand, was free to credit her testimony over Holland's speculative suggestion that her motives were retaliatory. We defer to the jury's assessment of her credibility.

2.

{¶ 66} Regarding Barger's testimony that she found Holland's DNA on 31 shell casings, Holland asserts that 1) the casings contained a "mixed profile," and 2) Barger conceded that there was no way to ascertain when Holland's DNA was transferred to the casings, such that she could not determine that Holland was the last person to touch them. Holland also notes that texting excluded him from "several pieces of evidence," including the KelTec rifle and nine 5X7 casings, and that Barger further conceded that, although she could identify three contributors of DNA on the booster seat, she could not

identify Holland as one of them.

{¶ 67} We cannot agree that Barger's testimony was as exculpatory as Holland suggests. Barger testified that if a person's DNA were not detected on an item, it did not mean that the person had never touched the item, but only that she was "not picking up any DNA." She stated that it is possible for a person to handle an item and not leave any DNA on it, and that it is not uncommon for her to be unable to obtain a DNA profile.

{¶ 68} Barger also testified that for the mixed DNA profile on the 31 shell casings, she obtained a "major component," which meant she found "peaks that are really high and peaks that are really small. The peaks that are really high [are] what are considered the major component, meaning that person left the most DNA behind. From that, I can match that major component back to the line to Allante Holland." Barger further stated that she was able to exclude Nicole Dukes, Nathan Miller, Andre Ferguson, Louis Holland, and Quasawn Taborn as being part of the mixed profile.

{¶ 69} Barger testified that all casings that were from the same caliber weapon and found within the same vicinity were swabbed together because the surface area on the casings was minimal; they were swabbed together to "concentrate any little bit of DNA on there to attempt to develop a DNA profile." According to Barger, the DNA profile was "entirely unique" and "that major profile * * * matches back to Allante Holland." Statistically, Barger stated that if "the world's population were to become a trillion times greater than it currently is overnight, [she] would expect that profile to match back to Allante Holland to the exclusion of all others, unless he had an identical twin."

{¶ 70} The facts that Holland was excluded from the KelTec rifle and nine 5x7

casings and that Barger could not determine that his DNA was present on the booster seat did not diminish the probative value of Barger's conclusion that the "major profile" on 31 casings from the scene specifically and uniquely matched Holland's DNA to a virtual certainty. Further, the KelTec rifle was located inside 228 Fer Don Road. Holland's reliance on Barger's testimony to establish that his conviction was against the manifest weight of the evidence is misplaced.

3.

{¶ 71} Regarding Det. Kellar's testimony that the cell phone from the scene belonged to Holland based upon the gmail account, hollandallante@gmail.com, having been downloaded from the phone as the registered owner, Holland notes that Det. Kellar never testified that the email account conclusively established that the phone belonged to Holland. According to Holland, email accounts can be accessed from multiple devices connected to the internet, and there was "no testimony regarding any other data linking * * * Holland to that phone." He notes that Yoak, the latent print examiner, testified that Holland's fingerprints were not found on the cell phone, and he argues that finding a phone in a particular place does not mean that the owner was there. While Kellar acknowledged that the location of a cell phone does not establish the owner's whereabouts and "no prints of value" were retrieved from the cell phone, evidence of a cell phone associated with Holland located very near the scene of Turner's shooting, coupled with Holland's possession of Turner's cell phone shortly after the shooting, supported the conclusion that Holland had been present during the melee on the street outside 228 Fer Don Road on July 17, 2020. Holland's reliance on Kellar's testimony to

support his claim that he was not present at the time of Turner's shooting is misplaced.

4.

{¶ 72} Finally, regarding the fingerprints on the booster seat, Holland cites Yoak's testimony that she found the prints of seven other people on the booster seat and could not determine how long the prints had been there. He notes that Erika testified that she and Holland had been friends since they were 17 years old and that he was an uncle to two of her children. Holland also notes that Erika allowed him to remain with her children after learning that Turner had been shot, asserting that it is "highly possible" that he left a print on the booster while caring for her children. Again, given all of the evidence supporting Holland's guilt, his reliance upon limitations of Yoak's testimony is misplaced.

{¶ 73} We have viewed the surveillance video of the shooting from 220 Fer Don Road obtained by Shiverdecker, State's Exhibit 215(A), the authenticity of which was stipulated by the parties. Shiverdecker obtained all the video that the camera recorded and described the six segments of video on State's Exhibit 215(A), which were taken by a motion sensitive camera. The video segments were recorded between 1:58:25 a.m. and 2:10 a.m. on July 17, 2020.

{¶ 74} Shiverdecker identified Nicole Dukes's Jeep Cherokee in the first video. He indicated that "flashes" that appeared in the second video were the result of someone firing a handgun. Six individuals were seen exiting the Jeep within five seconds of its arrival. According to Shiverdecker, the subsequent gunfire was directed toward 228 Fer Don Road. He testified:

> Q. * * * All right what are we seeing here * * * and what time is it

stopped at?

A.   We're 11 seconds into the video.   You see a flash of light from the * * * driver side, essentially, kind of toward the middle of the road there. There's several individuals that are there. * * *

* * *

A.   * * * Several individuals here.   You have two up high, you have two down low that fanned out when they got out of the car and started walking north on Fer Don toward 228 Fer Don.

Q.   With respect to what happens to [Turner], where should the jurors be looking next?

* * *

A.    - - ultimately, when you're watching the video, you're going to want to watch right here in this area.   You'll see some flashes; you'll see an individual backpedaling towards the car. As that person is backpedaling towards the Jeep, which still has the * * * rear hatch up, you'll see his gun flash, and you will see [Turner] fall right around here.

Shiverdecker identified Turner lying on the ground 17 seconds into the video.

**{¶ 75}** Based upon all of the evidence in the record, we cannot conclude that Holland's convictions for complicity to commit murder, improperly discharging a firearm at or into a habitation, discharge of a firearm on or near prohibited premises, and having weapons while under disability were against the manifest weight of the evidence.

**{¶ 76}**   Holland's first assignment of error is overruled.

{¶ 77} Holland's fifth assignment of error states:

THE TRIAL COURT ERRED WHEN IT FOUND THAT HOLLAND'S MAINTAINING INNOCENSE [sic] AND REMAINING SILENT AT SENTENCING AMOUNTED TO A LACK OF REMORSE.

{¶ 78} Holland argues that the trial court improperly found that his silence at sentencing demonstrated a lack of remorse. Holland argues that the court's statement on this point "was inappropriate and personalized the issue." He contends that the trial court was frustrated that Holland would not validate the court's belief that he was present at the scene and committed the offense. He argues that the court was "heavily influenced" by his alleged lack of remorse, which contributed to his lengthy sentence. According to Holland, his sentence is "inexorably tainted with the trial court's inappropriate consideration of his silence.

{¶ 79} The State responds that a trial court is required to consider whether a defendant has shown remorse in determining the risk of recidivism, which is relevant to sentencing, and the record simply reflects that the trial court considered the fact that Holland took no responsibility for his actions during his pre-sentence review. The State also asserts that this alleged error should be reviewed under a plain error standard, because Holland only generally objected to the sentence rather than to "any specific aspect of or rationale for the sentence."

{¶ 80} "Our review of the R.C. 2929.11 and 2929.12 sentencing factors is limited under R.C. 2953.08(G)(2)(b)." *State v. Gurto*, 11th Dist. Ashtabula No. 2022-A-0045, 2023-Ohio-2351, ¶ 15, citing *State v. Brunson,* 171 Ohio St.3d 384, 2022-Ohio-4299, 218

N.E.3d 765, ¶ 69. R.C. 2953.08(G) provides that, following review of the record, an appellate court "may increase, reduce, or otherwise modify a sentence that is appealed under this section or may vacate the sentence and remand the matter to the sentencing court for resentencing * * * if it clearly and convincingly finds * * * [t]hat the sentence is * * * contrary to law." R.C. 2953.08(G)(2)(b).

{¶ 81} R.C. 2929.12 sets forth factors for the court to consider at sentencing that indicate the offender is likely to commit future crime; the factor listed under R.C. 2929.12(D)(5) is that "[t]he offender shows no genuine remorse for the offense." "Whether a trial court improperly considered an offender's silence at sentencing as demonstrating a lack of remorse falls within the purview of whether a sentence is 'otherwise contrary to law,' and is thus proper for appellate review under R.C. 2953.08(G)(2)(b)." *Gurto* at ¶ 15.

{¶ 82} In *Brunson,* the supreme court determined that the trial court had erred in considering Brunson's silence as a factor in its lack-of-remorse analysis. *Brunson* at ¶ 71. Defense counsel had raised an issue about the court's consideration of Brunson's silence at the pre-sentence investigation meeting but failed to challenge the trial court's assertion that it could "use Brunson's waiver of allocution in its lack-of-remorse consideration." The supreme court determined that Brunson had forfeited all but plain error because his attorney had not objected to this specific sentencing issue at trial. *Id.* at ¶ 66-67.

{¶ 83} Brunson pled not guilty and was convicted after a jury trial. He remained silent at disposition, and the court inferred a lack of remorse from his silence. Citing

*Mitchell v. United States*, 526 U.S. 314, 326-328, 119 S.Ct. 1307, 143 L.Ed.2d 424 (1999), *Brunson* recognized that, generally, "negative inferences from a defendant's silence are not permitted under the Fifth Amendment, because it is the state's burden to prove that the defendant is guilty of the alleged crime and that the defendant has an interest in avoiding liability." *Brunson* at ¶ 78. *Brunson* held that the "focus in determining whether a negative inference from a defendant's silence may be considered as a demonstration of the defendant's lack of remorse is on whether the inference affects the factual determinations in the case"; the court concluded that, for a defendant who pled not guilty and proceeded to trial, a negative inference does so. *Id.*

{¶ 84} *Brunson* reasoned:

It is true that the state has no burden under R.C. 2929.12(D)(5) to prove that a defendant lacks remorse. Rather, that provision requires a trial court to consider whether "the offender shows no genuine remorse for the offense" in its recidivism determination. R.C. 2929.12(A) and (D)(5). That there is no burden on the state under R.C. 2929.12(D)(5) tends to support the conclusion that an exception to the general rule against negative inferences must apply in this situation.

The problem, however, is that for a defendant to have "remorse for the offense," the defendant must necessarily have committed or been involved in the offense. This is based on the plain meaning of "remorse." If a defendant is remorseful at sentencing, that necessarily means that the defendant has sadness, guilt, or regret for his or her involvement in the

offense. While a defendant may have been found guilty of an offense by the jury, this does not mean that the defendant committed the offense. And it must be stated again that remorse is not the same as sympathy—a person with remorse expresses it by acknowledging his or her wrongdoing.

Because "remorse" is a loaded term and showing remorse requires a person to acknowledge that he or she committed an offense, a finding of a lack of remorse necessarily goes "to factual determinations respecting the circumstances and details of the crime" (emphasis sic), *Mitchell*, 526 U.S. at 328, 119 S.Ct. 1307, 143 L.Ed.2d 424, because it implicates the defendant's role in the crime. For a criminal defendant who pleaded not guilty and took the case to trial, thus maintaining his or her innocence, a finding of a lack of remorse based on the defendant's silence is to use that silence to infer the defendant's involvement in the crime. * * * [S]uch an inference would go against the essential purpose of the right to remain silent — "to protect a defendant from being the unwilling instrument of his or her own condemnation," *id.* at 329, 119 S.Ct. 1307.

*Brunson* at ¶ 79-81.

{¶ 85} After the trial court in this case imposed Holland's sentence and made the necessary findings for the imposition of consecutive sentences, the following exchange occurred:

THE COURT: * * * You have multiple prior weapons offenses on your record, you have served time for prior weapons offenses. In this particular

case the number of people that were put at risk * * * we will never know how many people were in all of those houses. But what we do know is at least three or four of those houses had bullet holes in them from this incident and that [Turner] lost his life as a result of what I watched on that video, which was just utter mayhem.

I will also note that you have taken no responsibility for your actions in the interview with the pre-sentence investigator. You seem to indicate that you were not there and you still denied even being present. There was no showing of any remorse and the simple fact is, sir, I listened to the evidence and the jury found you guilty beyond a reasonable doubt as did the Court. So for those reasons, again, your total sentence * * * is going to be 40 years to 45 and one-half years.

* * *

THE COURT: * * * [Defense Counsel], anything that you would like to add or anything else?

[DEFENSE COUNSEL]: Just note our objection to the sentence for the record * * *.

{¶ 86} We initially note that Holland's argument that the court found him guilty beyond a reasonable doubt did not "personalize" the issue; it was a statement of fact, particularly because the court's statements regarding lack of remorse were made after he was found guilty by the court of having weapons under disability.

{¶ 87} Even if we considered defense counsel's general objection sufficient to

preserve this error for appeal, Holland's argument fails. Holland again mischaracterizes the record by minimizing the facts adduced at trial and by suggesting that the court was influenced by a lack of remorse more than the overwhelming evidence of his guilt or any other sentencing factor it considered. The court indicated that during the presentence investigation (PSI) interview, Holland denied being present at the shooting, took no responsibility for his actions, and showed no remorse; in other words, Holland provided a version of his involvement but did not deny all association with the events surrounding Turner's death, and the court considered the lack of remorse he demonstrated therein. The court did not specifically address Holland's decision to waive allocution and remain silent at sentencing in its lack-of-remorse consideration, as Holland suggests.

{¶ 88} Holland's PSI reflects that he reported residing at Meadows of Catalpa with his cousin. Holland gave some bullets to Turner there shortly before the shooting, at Turner's request, and Turner then left Meadows of Catalpa with Louis and three or four others. According to Holland, Louis later returned to Meadows of Catalpa and advised Holland that they needed to help Turner. According to Holland, Louis knew where to find Turner, and they proceeded to the scene of the shooting; Turner "ended up deceased." Holland indicated that he had left his phone in Turner's vehicle and that his fingerprints had been found on a booster seat and a bullet at the scene.

{¶ 89} Holland admitted at least a tangential relationship to the shooting and the other shooters in his PSI interview. We have no basis to conclude that the trial court drew negative inferences from Holland's silence at sentencing, such that the court affected the factual determinations in the case, and our conclusion is not inconsistent with

*Brunson.* The court did not mention Holland's waiver of his right of allocution. In other words, we conclude that the court's sentence reflects that the court considered the necessary sentencing factors, including R.C. 2929.12(D)(5), and therefore Holland's sentence is not contrary to law.

{¶ 90} For the foregoing reasons, Holland's fifth assignment of error is overruled.

{¶ 91} Finally, Holland's sixth assignment of error is as follows:

THE TRIAL COURT FAILED TO PROPERLY ADVISE HOLLAND OF HIS RIGHTS UNDER THE REGAN [SIC] TOKES ACT AS REQUIRED BY R.C. 2929.19.

{¶ 92} In his final assignment of error, Holland argues that the trial court failed to properly provide the Reagan Tokes Act notifications required by R.C. 2929.19(B)(2)(C) at sentencing. R.C. 2929.19(B)(2) states that, if the sentencing court determines at the sentencing hearing that a prison term is necessary or required, the court must engage in all seven enumerated actions specified in that subsection. Of importance here, R.C. 2929.19(B)(2)(c) identifies notifications that the trial court must provide if it imposes a non-life felony indefinite prison term pursuant to the Reagan Tokes Act. "Those notifications generally pertain to the offender's minimum and maximum prison term and to the existence and operation of a rebuttable presumption of release from service of the sentence upon expiration of the minimum term." *State v. Clark,* 2d Dist. Montgomery No. 29295, 2022-Ohio-2801, ¶ 7. Specifically, the trial court must notify the offender:

(i) That it is rebuttably presumed that the offender will be released from service of the sentence on the expiration of the minimum prison term

imposed as part of the sentence or on the offender's presumptive earned early release date, as defined in section 2967.271 of the Revised Code, whichever is earlier;

(ii) That the department of rehabilitation and correction may rebut the presumption described in division (B)(2)(c)(i) of this section if, at a hearing held under section 2967.271 of the Revised Code, the department makes specified determinations regarding the offender's conduct while confined, the offender's rehabilitation, the offender's threat to society, the offender's restrictive housing, if any, while confined, and the offender's security classification;

(iii) That if, as described in division (b)(2)(c)(ii) of this section, the department at the hearing makes the specified determinations and rebuts the presumption, the department may maintain the offender's incarceration after the expiration of that minimum term or after that presumptive earned early release date for the length of time the department determines to be reasonable, subject to the limitation specified in section 2967.271 of the Revised Code;

(iv) That the department may make the specified determinations and maintain the offender's incarceration under the provisions described in divisions (B)(2)(c)(i) and (ii) of this section more than one time, subject to the limitation specified in section 2967.271 of the Revised Code;

(v) That if the offender has not been released prior to the expiration of the

offender's maximum prison term imposed as part of the sentence, the offender must be released upon the expiration of that term.

R.C. 2929.19(B)(2)(c)(i)-(v).

**{¶ 93}** We previously have held that an indefinite prison sentence under the Reagan Tokes Act is contrary to law when the trial court fails to notify the offender at the sentencing hearing of the information set forth in R.C. 2929.19(B)(2)(c). *E.g., State v. Massie,* 2d Dist. Clark No. 2020-CA-50, 2021-Ohio-3376, ¶ 23; *State v. Thompson,* 2d Dist. Clark No. 2020-CA-60, 2021-Ohio-4027, ¶ 29; *Clark* at ¶ 7; *State v. McLean,* 2d Dist. Montgomery No. 29268, 2022-Ohio-2806, ¶ 14; *State v. Gatewood,* 2d Dist. Clark No. 2021-CA-20, 2022-Ohio-2513, ¶ 14.

**{¶ 94}** The State argues that because Holland only generally objected to the sentence and not specifically to any part of the Reagan Tokes sentence or advisement, a plain error standard of review applies. However, when reviewing a felony sentence, appellate courts must apply the standard of review set forth in R.C. 2953.08(G)(2). *State v. Marcum,* 146 Ohio St.3d 516, 2016-Ohio-1002, 59 N.E.3d 1231, ¶ 7. Pursuant to that statute, an appellate court may increase, reduce, or modify a sentence, or it may vacate the sentence and remand for resentencing, only if it clearly and convincingly finds either: (1) the record does not support the sentencing court's findings under certain statutes; or *(2) the sentence is otherwise contrary to law.* (Emphasis added.) *Id.* at ¶ 9, citing R.C. 2953.08(G)(2).

**{¶ 95}** With respect to the discharge of a firearm on or near prohibited premises count, the court stated to Holland at sentencing:

* * * Now that has an indefinite sentence, sir, and I want to explain what that means to you. Okay?

The court is sentencing you on the underlying charge of 11 years to 16-and-a-half years and that is due to a statute that is referred to as the Reagan Tokes statute. On that particular count, and I'm going to take that count by itself, okay, your term on that count, the maximum term that the Court gave is the 11 years. That is the maximum the Court could give, it is what the Court is sentencing you to.

Reagan Tokes indicates that you – on that particular count you would have to serve that 11 years. Okay? And you should be expected to be able to be released when that 11 years is up on that count.

However, if while you are in the institution you show a lack of rehabilitation and/or compromise the safety of inmates or staff that show – or show a continuing threat to society, that presumption that you would get out at the earlier part of that sentence can be overcome. And the adult parole authority can hold you for an additional five and one-half years. That is half the original sentence.

Trial Tr. 917-918.

**{¶ 96}** Upon review of the sentencing transcript, we find that the trial court failed to fulfill the requirements of the statute and notify Holland of the information set forth in R.C. 2929.19(B)(2)(c) at the sentencing hearing. While the trial court did include in the sentencing entry the language set forth in R.C. 2929.19(B)(2)(c), the statute requires that

the notification take place at the sentencing hearing. Accordingly, we sustain Holland's sixth assignment of error and find that his sentence as to count seven only, discharge of a firearm on or near prohibited premises, is contrary to law.

{¶ 97} This matter is reversed solely as to Holland's sentence for discharge of a firearm on or near prohibited premises, and it is remanded to the trial court for resentencing on this offense in accordance with R.C. 2929.19(B)(2)(c). The judgment of the trial court is affirmed in all other respects.

. . . . . . . . . . . . .

WELBAUM, P.J. and TUCKER, J., concur.